## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Julie M. Dunnigan, <br><br>            Plaintiff, <br><br> v. <br><br> Federal Home Loan Mortgage Corporation d/b/a Freddie Mac, <br><br>            Defendant. | Case No. 15-cv-2626 (SRN/JSM) <br><br><br> **MEMORANDUM OPINION** <br> **AND ORDER** |

John H. Goolsby, Goolsby Law Office, LLC, 475 Cleveland Ave. N., Ste. 212, St. Paul, MN 55104, for Plaintiff.

Ashley M. DeMinck and Ellen B. Silverman, Hinshaw & Culbertson, LLP, 333 South 7th St., Ste. 2000, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Defendant Federal Home Loan Mortgage Corporation d/b/a Freddie Mac's ("Freddie Mac") Motion to Dismiss [Doc. No. 25]. For the reasons set forth below, the Motion is granted in part and denied in part.

## I.    BACKGROUND

### A.  Factual History[1]

Plaintiff Julie M. Dunnigan ("Dunnigan") lives in Minnesota and is a member of a low- or moderate-income family.  (Second Am. Compl. ("Compl.") at ¶¶ 2, 7 [Doc. No.

---

[1] When deciding a motion to dismiss for failure to state a claim, "a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant."  U.S. ex rel. Raynor v. Nat'l Rural Utilities Co-op. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012).  Thus, the Court recounts the facts as set forth by Dunnigan.

51].)  Freddie Mac is a government sponsored enterprise ("GSE") created in part to facilitate financing of affordable housing for low- and moderate-income families.[2]  (See Compl. at ¶ 6 (citing 12 U.S.C. § 4501).)  To do this, Freddie Mac buys mortgages on the secondary market from lenders (sometimes referred to as "originators") and sells them as mortgage-backed securities.  (See id. at ¶ 8.)  According to Dunnigan, lenders are disinclined to offer certain types of mortgages unless they know that Freddie Mac, or some other GSE, will purchase them later.  (See id. at ¶¶ 9–10, 28–29.)

To assist lenders in knowing whether Freddie Mac will purchase a potential mortgage, Freddie Mac provides lenders with automated mortgage underwriting software called Loan Prospector ("LP").[3]  (Id. at ¶ 11.)  Dunnigan alleges that LP is a proprietary system, not subject to the control of the lenders, which assembles and evaluates consumer credit information, as well as other information.  (See id. at ¶¶ 12–14.)  Using data input into the system by the loan originator—such as credit reports from credit reporting agencies[4] and information provided by the borrower in his/her loan application—LP generates a "Risk Class" evaluation which classifies a prospective mortgage as "Accept" or "Caution."  (See id. at ¶¶ 15–17.)  LP also provides a "Feedback Certificate" to the

---

[2] The Federal National Mortgage Association (commonly known as "Fannie Mae") is also a GSE similar to Freddie Mac.  See 12 U.S.C. § 4501.

[3] Fannie Mae does, or in the recent past did, employ automated underwriting software called Desktop Underwriter ("DU") which is similar, if not identical in function, to Freddie Mac's LP software.  See Zabriskie v. Fed. Nat. Mortgage Ass'n, 109 F. Supp. 3d 1178, 1180–82 (D. Ariz. 2014) (describing the LP and DU programs).

[4] https://www.usa.gov/credit-reports (listing Equifax, Experian, and TransUnion as credit reporting agencies) (last visited March 28, 2016).

lender which includes the Risk Class, an assessment of whether the potential mortgage is eligible for purchase by Freddie Mac, "Credit Report Information," "Credit Risk Comments," and "Loan Processing Information." (See id. at ¶¶ 18–21.) Dunnigan claims that LP uses interstate commerce to prepare and communicate these Feedback Certificates and that lenders pay a fee to use the software. (See id. at ¶¶ 22, 30.)

Important to the present matter, Dunnigan alleges that the Feedback Certificates generated by LP communicate more than just whether Freddie Mac will subsequently purchase the potential mortgage. (Id. at ¶ 23.) According to her, they also communicate Freddie Mac's assessment of the likelihood of default and the borrower's credit worthiness. (Id. at ¶¶ 23–25, 28.) If LP returns a Risk Class of "Caution," the lender is required to manually underwrite the mortgage, which is difficult for the lender. (See id. at ¶¶ 26–27.)

Dunnigan had a home mortgage loan through M & T Bank ("M & T"). (Compl. at ¶ 31.) She was never delinquent on her mortgage payments. (Id. at ¶¶ 32, 34.) In 2008, Dunnigan discharged the M & T mortgage in Chapter 7 bankruptcy. (Id. at ¶ 33.) However, it was not until early 2013 that M & T reported Dunnigan's 2008 mortgage discharge to Equifax. (Id. at ¶ 35.) Important to her claims, Dunnigan alleges that although M & T reported the 2008 discharge in 2013, it did not report that the discharge *occurred* in 2013. (Id. at ¶ 36.)

In July of 2013, Dunnigan applied for a refinanced mortgage loan through the Home Affordable Refinance Program ("HARP"). (Id. at ¶¶ 37–38.) Dunnigan's lender

submitted her loan application and other information to LP.   (See id. at ¶ 40.)   LP returned a Feedback Certificate containing a "Caution" Risk Class and other statements which suggested Dunnigan was recently delinquent on her M & T mortgage.   (See id. at ¶¶ 58–61.)   Dunnigan claims that despite both M & T and Equifax correctly reporting that her mortgage was discharged via bankruptcy in 2008, LP treated the mortgage as 90 or more days delinquent within twelve months of July 2013.   (See id. at ¶¶ 41–44.) Dunnigan alleges that LP's classification of her M & T mortgage as delinquent was false and misleading, the product of an "intentional design," and ultimately resulted in the "Caution" Risk Class assessment.   (See id. at ¶¶ 45–49.)   More specifically, she contends that LP used the date M & T reported her mortgage's discharge (2013) instead of the date the discharge actually occurred (2008).   (See id. at ¶¶ 50–53.)   Dunnigan claims that if LP had used the actual date of her bankruptcy, rather than the date it was reported, she would not have received the "Caution" Risk Class or other negative comments in the Feedback Certificate.   (See id. at ¶¶ 54–61.)   She alleges that because of the Feedback Certificate, the lender denied her mortgage application.   (Id. at ¶ 62.)

Upon learning her mortgage was not approved because of the LP Feedback Certificate, Dunnigan contacted Freddie Mac to investigate.   (Id. at ¶ 63.)   A Freddie Mac representative informed her that Equifax was reporting a delinquency related to the M & T mortgage.[5]   (Id. at ¶ 64.)   Dunnigan disputed that she was delinquent on that account,

---

[5] Dunnigan claims that Equifax was never reporting any delinquency.   (Compl. at ¶¶ 65, 73.)

but was told to contact M & T.  (Id. at ¶¶ 66, 68.)  When Dunnigan contacted M & T, it denied reporting any delinquencies on her mortgage.  (Id. at ¶ 69.)

After speaking with M & T, Dunnigan contacted Freddie Mac again to dispute the delinquency report.  (Id. at ¶ 70.)  A Freddie Mac representative again claimed that Equifax was reporting the delinquency and said that he would provide Dunnigan what she needed to "fight" Equifax's report.  (Id.  at ¶ 72.)  At about this same time, Dunnigan was denied a refinance mortgage by a different lender as a result of another LP Feedback Certificate with the same "Caution" Risk Class assessment and other information related to Dunnigan's supposed mortgage delinquency.  (See id. at ¶¶ 74–79.)  Dunnigan claims she was subsequently denied the ability to refinance her mortgage by at least two other lenders based on LP Feedback Certificates containing the same information.  (See id. at ¶¶ 80–82, 85–87, 91–93.)

From August through November of 2013, Dunnigan continued to contact Freddie Mac and dispute the delinquency and related Feedback Certificates.  (See id. at ¶¶ 83, 88–90, 96–99.)  According to Dunnigan, by September 6, 2013, Freddie Mac knew that LP's classification of her M & T mortgage as delinquent was the result of LP's erroneous treatment of the reporting date of Dunnigan's bankruptcy as the date of the bankruptcy itself.   (Id. at ¶ 88.)  Despite this fact, Dunnigan contends Freddie Mac continued to represent that the problem was how Equifax was reporting the bankruptcy.  (Id. at ¶¶ 90, 96, 99, 101.)  Furthermore, Dunnigan claims Freddie Mac representatives falsely told her that they sent the information needed to resolve the problem to Equifax, but that Equifax

refused to correct its error.  (Id. at ¶¶ 96–99.)  She also alleges that Freddie Mac refused to provide her with copies of what Equifax was reporting.  (Id. at ¶ 95.)

In reliance on these alleged false representations by Freddie Mac, Dunnigan spent "many infuriating hours making telephone calls and written correspondence to Equifax and M & T," as well as time, effort, and money filing a complaint against Equifax with the Minnesota Attorney General's Office and a lawsuit against Equifax.  (See id. at ¶¶ 102–04.)  Moreover, she alleges that because of Freddie Mac's actions and omissions, she was denied credit, experienced delays in receiving credit, received credit on less favorable terms, incurred "out-of-pocket expenses," suffered damage to her credit rating, and harm to her reputation.  (See id. at ¶ 127.)  Dunnigan also claims she suffered "substantial emotional distress," severe enough that she sought treatment for stress-induced stomach issues.[6]  (See id. at ¶¶ 128.)

### B.  Procedural History

---

[6] Dunnigan filed her Second Amended Complaint on March 31, 2016, nearly four months after the Court's hearing on Freddie Mac's Motion to Dismiss.  The Court briefly summarizes the additional allegations in the Second Amended Complaint.  Dunnigan claims that she first sought a refinance mortgage in 2011.  (Compl. at ¶ 106.)  She contends that Freddie Mac's LP software incorrectly categorized a different mortgage she held with Wells Fargo Home Mortgage ("WFHM") as 90 days delinquent within the past twelve months based on the erroneous use of the date when the discharge of that mortgage in bankruptcy was reported as opposed to the date the discharge actually occurred.  (See id. at ¶¶ 107–120.)  As a result, Dunnigan alleges LP generated Feedback Certificates with the "Caution" Risk Class and other information causing lenders to deny her applications for a refinance mortgage.  (Id. at ¶¶ 121–24.)  She also alleges that later in 2013, the LP software indicated she had two delinquent mortgages (presumably the M & T and WFHM mortgages).  (Id. at ¶ 125.)

Based on the facts described above, Dunnigan brings various claims against Freddie Mac. (<u>See</u> Compl., Counts I–VII.) Dunnigan alleges that Freddie Mac violated the Fair Credit Reporting Act ("FCRA") in at least two ways. First, she claims Freddie Mac "willfully and/or negligently" failed to follow reasonable procedures to ensure the "maximum possible accuracy" of her consumer reports. (Compl., Count I at ¶¶ 131–35.) Second, Dunnigan contends Freddie Mac "willfully and/or negligently" failed to conduct a "reasonable reinvestigation" of her dispute(s) and failed to "appropriately delete or modify information in [Dunnigan's] file." (Compl., Count II at ¶¶ 136–40.) In addition to her FCRA claims, Dunnigan asserts state common law claims for defamation, (Compl., Count III at ¶¶ 141–44), negligence, (Compl., Count IV at ¶¶ 145–48), fraud (Compl., Count V at ¶¶ 149–52), negligent misrepresentation (Compl., Count VI at ¶¶ 153–56), and intentional infliction of emotional distress, (Compl., Count VII at ¶¶ 157–61) (collectively, the "State Law Claims").

Freddie Mac now moves to dismiss the FCRA claims as well as the state law claims for negligence, negligent misrepresentation, and fraud. (<u>See</u> Mot. to Dismiss.) Freddie Mac argues that it is not a credit/consumer reporting agency[7] ("CRA") and does not generate consumer reports, making the provisions of the FCRA inapplicable to it. (Def.'s Mem. of Law in Supp. ("Mem. in Supp.") at 7–20 [Doc. No. 31]; Def.'s Reply Mem. of Law in Supp. ("Reply") at 2–13 [Doc. No. 36].) Freddie Mac further contends that it did not owe Dunnigan any duty of care and thus her claims of negligence and

---

[7] The terms "credit reporting agency" and "consumer reporting agency" are often used interchangeably when addressing FCRA claims.

negligent misrepresentation should be dismissed.  (Mem. in Supp. at 20–22; Reply at 13–16.)  Lastly, Freddie Mac argues that Dunnigan's fraud claim must be dismissed because she failed to plead the necessary elements of reasonable reliance and pecuniary damages. (Mem. in Supp. at 23–24; Reply at 16.)  Dunnigan argues that she has adequately pled all of her claims.  (See Pl.'s Mem. of Law in Opp. ("Mem. in Opp.") [Doc. No. 22].)

## II.      DISCUSSION

### A.  Standard of Review

When evaluating a motion to dismiss, the Court assumes the facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the plaintiff.  Morton v. Becker, 793 F.2d 185, 187 (8th Cir. 1986).  However, the Court need not accept as true wholly conclusory allegations, Hanten v. School District of Riverview Gardens, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions the plaintiff draws from the facts pled, Westcott v. City of Omaha, 901 F.2d 1486, 1488 (8th Cir. 1990). To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  Id. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  Twombly, 550

U.S. at 556.

## B.  The FCRA Claims

The parties dispute whether Freddie Mac is a CRA subject to the requirements of

the FCRA.  The FCRA defines a CRA as:

> any person which, for monetary fees, dues, or on a cooperative nonprofit
> basis, regularly engages in whole or in part in the practice of assembling or
> evaluating consumer credit information or other information on consumers
> for the purpose of furnishing consumer reports to third parties, and which
> uses any means or facility of interstate commerce for the purpose of
> preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f).  Based on this definition, an entity is a CRA if it satisfies four

requirements: "(1) it acts in exchange for compensation of the kind described; (2) it

'regularly' 'assembles' or 'evaluates' information on consumers; (3) its purpose in doing

so is to furnish consumer reports; and (4) it utilizes interstate commerce in the

preparation or furnishing of a consumer report."  Lewis v. Ohio Prof'l Elec. Network

LLC, 190 F. Supp. 2d 1049, 1056 (S.D. Ohio 2002) (quoting 15 U.S.C. § 1681a(f)); see

McCalmont v. Fed. Nat. Mortgage Ass'n, No. 2:13-CV-2107-HRH, 2014 WL 3571700,

at *4 (D. Ariz. July 21, 2014) (same, quoting Lewis); see also Zabriskie v. Fed. Nat.

Mortgage Ass'n, 109 F. Supp. 3d 1178, 1183 (D. Ariz. 2014) (describing the same

requirements as five factors).

### 1.  Freddie Mac's Argument and Supporting Documentation

Freddie Mac maintains it is not a CRA because it does not regularly assemble or

evaluate credit information as contemplated by the FCRA, but rather licenses software

(LP) to lenders that allows the lenders to perform these tasks.  (See Mem. in Supp. at 8–

12; Reply at 2–6.)  Furthermore, Freddie Mac claims it is not a CRA even if a lender's use of LP were attributable to it.  (See Mem. in Supp. at 15–17; Reply 9–12.)  Lastly, Freddie Mac contends that the materials generated by LP are not consumer reports that fall within the FCRA.  (See Mem. in Supp. at 17–19; Reply at 12–13.)

In support of its contentions, Freddie Mac relies heavily on an LP User Agreement ("User Agreement") and Single Family Seller/Servicer Guide ("Guide").  (See Appendix to Mem. in Supp. [Doc. No. 27].)  No affidavit explaining these documents or attesting to their authenticity was provided.  Nonetheless, Freddie Mac claims the Court may consider them because they are "referenced in the Amended Complaint . . . ." (Mem. in Supp. at 3, n.2.)  Freddie Mac also relies on the argument and assertions of its counsel regarding what LP does and how it functions—arguments made with no citation to the record.  (See, e.g., Mem. in Supp. at 4 (claiming Freddie Mac does not view or access credit reports used by the LP software), 5 (arguing Feedback Certificates are not a substitute for a lender's own mortgage underwriting processes), and 9 (contending that lenders, using the LP software, are the ones who assemble and evaluate prospective borrower's applications and credit information); Reply at 3, n.1 (claiming Freddie Mac does not charge a fee for submissions to LP).)

As an initial matter, the Court must decide whether or not these documents are embraced by the pleadings.  See Stahl v. U.S. Dep't of Agric., 327 F.3d 697, 701 (8th Cir. 2003) ("The court has complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6)

motion." (quotations omitted)).  For the reasons that follow, the Court will not consider them.

Courts ordinarily do not consider matters outside the pleadings on a motion to dismiss.  See Fed. R. Civ. P. 12(d).  Matters outside the pleadings include "any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings."  Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992) (quotations omitted).  "[F]acts asserted in the memoranda [supporting a motion to dismiss] themselves, as well as statements made at oral argument, may not be considered unless they were first asserted in the pleadings." Folger v. City of Minneapolis, 43 F. Supp. 3d 922, 930 (D. Minn. 2014).

A court may, however, consider exhibits attached to the complaint, documents that are necessarily embraced by the pleadings, and public records. Little Gem Life Scis., LLC v. Orphan Med., Inc., 537 F.3d 913, 916 (8th Cir. 2008).  "Documents necessarily embraced by the pleadings include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.'" Ashanti v. City of Golden Valley, 666 F.3d 1148, 1151 (8th Cir. 2012) (quoting Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003)).  For instance, the contract upon which a claim rests is necessarily embraced by the pleadings and may be considered.  Gorog v. Best Buy Co., 760 F.3d 787, 791 (8th Cir. 2014).

The Court will not consider Freddie Mac's User Agreement and Guide or the unsupported assertions of its counsel regarding those documents.  First, Freddie Mac is

simply incorrect that the User Agreement and Guide are referenced in—and thus embraced by—Dunnigan's complaint. The Second Amended Complaint discusses the LP software, but there is no mention of the User Agreement or Guide. Nor can the Court fairly conclude that the content of those documents is referenced in the Second Amended Complaint.

Second, Freddie Mac offers the User Agreement and Guide for the purpose of contradicting Dunnigan's claims about who uses the LP software, how it functions, and what it generates. Materials outside the pleadings offered for such contradictory or supplementary purposes may not be considered. See Wieland v. U.S. Dep't of Health & Human Servs., 793 F.3d 949, 953 (8th Cir. 2015) (certain materials which "do not contradict the complaint" may be considered on a motion to dismiss); Loeffler v. City of Anoka, 79 F. Supp. 3d 986, 993 (D. Minn. 2015) (refusing to consider defendants' exhibits since they were not just more complete versions of an exhibit attached to the complaint, but rather contained different information entirely). Furthermore, Dunnigan disputes the authenticity and completeness of the User Agreement. (See Mem. in Opp. at 9–10.) This dispute prevents the Court from considering that document. See Ashanti, 666 F.3d at 1151 (only documents "whose authenticity no party questions" are embraced by the pleadings).

Third, the assertions of Freddie Mac's counsel related to the User Agreement, Guide, and the LP software are matters outside the pleadings that will not be considered. See Folger, 43 F. Supp. 3d at 930. The case Johnson v. Casey's Gen. Stores, Inc., 116 F.

Supp. 3d 944 (W.D. Mo. 2015) offers a useful comparison. There, the plaintiff alleged that the defendant violated the FCRA by procuring her consumer reports without first disclosing that those reports could be obtained for employment purposes. Johnson, 116 F. Supp. 3d at 945. The defendant moved to dismiss the complaint and argued that the report it obtained was not a consumer report under the FCRA. Id. at 946–47. The court held:

> At this time, the only issue before the Court is whether Plaintiff has alleged enough in her Complaint to proceed. Defendant's arguments go well beyond what is pled in Plaintiff's Complaint. The specific terms of [the defendant's] alleged background check policy; why any such background checks were procured; who may or may not have had access to the background report; and whether the report was investigative are all issues that would require analysis of information and evidence beyond Plaintiff's initial allegations. In analyzing the pending Motion to Dismiss, the Court will not venture beyond Plaintiff's Complaint.

Id. at 947. Considering Freddie Mac's arguments about how the LP software functions, why it is used, who uses it, and what it generates "would require analysis of information and evidence beyond" Dunnigan's initial allegations. See id. When analyzing the pending Motion to Dismiss, this Court too "will not venture beyond" Dunnigan's complaint. See id.

### 2.  The Sufficiency of Dunnigan's FCRA Claims

Dunnigan has sufficiently pled her FCRA claims so as to survive Freddie Mac's Motion to Dismiss. She provides factual allegations about what LP does and the Feedback Certificates it produces, (Compl. at ¶¶ 11–30), argues that their actions constitute assembling and evaluating credit information, (id. at ¶¶ 12–13), claims Freddie

Mac is paid by lenders for their use of LP, (id. at ¶ 30), and asserts that Freddie Mac uses interstate commerce to both prepare and furnish the Feedback Certificates, (id. at ¶ 22).

However, the Court remains skeptical of Dunnigan's claim that Freddie Mac is a CRA subject to the FCRA's requirements.  Dunnigan points to a single case supporting her position that Freddie Mac is a CRA.  See Zabriskie, 109 F. Supp. 3d 1178 (denying defendant Fannie Mae's motion to dismiss the plaintiff's FCRA claims and finding that Fannie Mae was a CRA by virtue of its automated underwriting software).[8]  At least three other courts, including a judge from the same federal district as the judge in Zabriskie, support Freddie Mac's position that it is not a CRA.  See McCalmont, 2014 WL 3571700 (holding that Fannie Mae was not a CRA by virtue of its automated underwriting software and dismissing the plaintiff's FCRA claims); Weidman v. Fed. Home Loan Mortgage Corp., 338 F. Supp. 2d 571 (E.D. Pa. 2004) (granting Freddie Mac summary judgment on the plaintiff's FCRA claims by finding that Freddie Mac was a "joint user" of consumer reports and thus not subject to the FCRA's requirements); Thomas v. Cendant Mortgage, No. CIV.A. 03-1672, 2004 WL 2600772 (E.D. Pa. Nov. 15, 2004) (finding that Freddie Mac and Fannie Mae were not CRAs by virtue of their automated underwriting software).  If Freddie Mac's claims about who uses the LP software, what purpose it is used for, how it works, and what material it generates are correct, it is

---

[8] The Zabriskie Court recently reaffirmed this holding and granted the plaintiff partial summary judgment on the issue of whether Fannie Mae was a CRA.  Zabriskie v. Fed. Nat'l Mortgage Ass'n, No. CV-13-02260-PHX-SRB, 2016 WL 759567, at *2–4 (D. Ariz. Feb. 24, 2016).

difficult to see how Freddie Mac could be considered a CRA as set forth in 15 U.S.C. § 1681a(f).[9]   But, the Court must have a record on which to base its ultimate determination.[10]   The Court will allow discovery related to Freddie Mac's status, or lack thereof, as a CRA.   Therefore, Freddie Mac's Motion to Dismiss the FCRA claims is denied without prejudice to raise this issue in a future dispositive motion.

### C. The State Law Claims

#### 1. Preemption and Qualified Immunity

Freddie Mac challenges Dunnigan's negligence, negligent misrepresentation, and fraud claims.   However, in raising those challenges and responding to them, neither party addressed the issue of preemption and qualified immunity under the FCRA.[11]

The FCRA provides in relevant part:

---

[9] Both parties offer extensive arguments about whether and how other provisions of the FCRA and Federal Trade Commission guidance impact Freddie Mac's status as a CRA. (See Mem. in Supp. at 11–19; Mem. in Opp. at 16–18, 22–34; Reply at 6–8, 9–12.) Again, before the Court can address these arguments, it must have a record to assess who uses the LP software, for what purpose, how that software functions, and what it produces.

[10] At the hearing on the Motion to Dismiss, Dunnigan argued that Freddie Mac's status as a CRA was a disputed question of fact for a jury to resolve.   The Court disagrees. Whether Freddie Mac is a CRA is a matter of law for the Court to determine.   Notably, every case cited by the parties on the subject of Freddie Mac's or Fannie Mae's status as a CRA dealt with this issue as a question of law.   Dunnigan did not cite, nor could the Court find, a single case where an entity's status as a CRA was determined by a factfinder.

[11] The Court may raise this issue *sua sponte*.   See Granville Alley v. Farmers Bank, Inc., No. 3:13-CV-146 CAR, 2014 WL 4287103, at *7 (M.D. Ga. Aug. 29, 2014); Cosmas v. Am. Exp. Centurion Bank, No. CIV.07-6099 (FLW), 2010 WL 2516468, at *15 (D.N.J. June 14, 2010); Stith v. Thorne, No. CIVA 3:06-CV-00240-D, 2006 WL 5444366, at *12, n.5 (E.D. Va. Oct. 30, 2006).

> Except as provided in sections 1681n [willful violations of the FCRA] and 1681o [negligent violations of the FCRA] of this title, no consumer may bring any action or proceeding *in the nature of* defamation, invasion of privacy, or negligence with respect to the reporting of information *against any consumer reporting agency, any user of information*, or any person who furnishes information to a consumer reporting agency, based on information disclosed pursuant to section 1681g [governing disclosures to consumers by CRAs and others], 1681h, or 1681m [governing disclosures by users of consumer reports] of this title, . . . except as to false information furnished with malice or willful intent to injure such consumer.

15 U.S.C. § 1681h(e) (emphasis added).  When this provision applies, it preempts state law claims for defamation, negligence, fraudulent misrepresentation, and intentional infliction of emotional distress, entitling a defendant to qualified immunity against the same.  See Thornton v. Equifax, Inc., 619 F.2d 700, 703 (8th Cir. 1980) (defamation and negligence); Gohman v. Equifax Info. Servs., LLC, 395 F. Supp. 2d 822, 828–29 (D. Minn. 2005) (defamation); Graham v. CSC Credit Servs., Inc., 306 F. Supp. 2d 873, 881–82 (D. Minn. 2004) (defamation and negligence); Ilodianya v. Capital One Bank USA NA, 853 F. Supp. 2d 772, 775 (E.D. Ark. 2012) (defamation and intentional infliction of emotional distress); Arra v. All Occasion Limousine, Inc., No. 1:13 CV 1317, 2013 WL 5874754, at *2 (N.D. Ohio Oct. 30, 2013) (fraud); Hill v. Equifax Info. Servs., LLC, 974 F. Supp. 2d 865, 877–78 (M.D.N.C. 2013) (fraud and intentional infliction of emotional distress); but see Adams v. Nat'l Eng'g Serv. Corp., 620 F. Supp. 2d 319, 335 (D. Conn. 2009) (no qualified immunity against intentional infliction of emotional distress claim); Davis v. Maryland Bank, No. 00-04191, 2002 WL 32713429, at *14 (N.D. Cal. June 19, 2002) (same).

The statute carves out an exception to this qualified immunity where the false information is produced with "malice or willful intent to injure [the] consumer." 15 U.S.C. § 1681h(e). This requires more than "mere negligence 'and probably even more than highly unreasonable conduct.'" Gohman, 395 F. Supp. 2d at 829 (quoting Hirman v. Rogers, 257 N.W.2d 563, 566 (Minn. 1977)). If the information is produced "with knowledge that it was false or with reckless disregard of whether it was false or not," then the state law claims are not preempted. See Thornton, 619 F.2d at 705 (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964)). However, merely unreasonable conduct "is insufficient to show malice or willful intent to injure." Gohman, 395 F. Supp. 2d at 829.

Dunnigan's State Law Claims are based on the same acts and omissions as her FCRA claims. See Edeh v. Equifax Info. Servs., LLC, No. 11-cv-2671 (SRN/JSM), 2012 WL 4378189, at *1 (D. Minn. Sept. 25, 2012) (noting that state law claims stemming from acts that form the basis of a plaintiff's FCRA claims are generally preempted). As described above, her State Law Claims are of the exact type numerous other courts have found preempted by the FCRA. The remaining question is whether § 1681h(e) applies under the specific facts of this case. A more developed record, as well as briefing on the issue, is necessary for the Court to make this determination. See Gohman, 395 F. Supp. 2d at 829 (considering § 1681h(e)'s applicability on a motion for summary judgment); Reed v. Experian Info. Sols., Inc., 321 F. Supp. 2d 1109, 1116–17 (D. Minn. 2004) (same); Graham, 306 F. Supp. 2d 873, 881–82 (same). The Court will entertain argument

on the preemption issue if and when Freddie Mac moves for summary judgment in this case.

The Court now turns to Freddie Mac's challenges to Dunnigan's negligence, negligent misrepresentation, and fraud claims.

### 2.  Negligence and Negligent Misrepresentation

Freddie Mac argues that it did not owe a duty of care to Dunnigan, and to the extent it did, it did not breach that duty.  (See Mem. in Supp. at 20–22; Reply at 13–16.)  In response, Dunnigan claims that Freddie Mac owed her statutory duties as well as a general duty of reasonable care that were breached when Freddie Mac communicated the allegedly erroneous Feedback Certificates to her lenders and mislead her about the reason for the "Caution" Risk Class assessment.  (See Mem. in Opp. at 40–42.)

In Minnesota, the existence of a duty of care and breach of that duty are essential elements for claims of both negligence and negligent misrepresentation.  See Lubbers v. Anderson, 539 N.W.2d 398, 401 (Minn. 1995) (discussing the elements for a claim of negligence); Williams v. Smith, 820 N.W.2d 807, 815 (Minn. 2012) (discussing the elements for a claim of negligent misrepresentation).  "Negligence is the breach of a legal duty."  Steffey v. Soo Line R. Co., 498 N.W.2d 304, 307 (Minn. Ct. App. 1993) "Generally, a defendant's duty to a plaintiff is a threshold question because in the absence of a legal duty, the negligence claim fails."  Domagala v. Rolland, 805 N.W.2d 14, 22 (Minn. 2011) (quotations and alterations omitted).  "A legal duty of care is imposed either by the common law rule requiring exercise of ordinary care not to injure another,

18

or by a statute designed for the protection of others."  Wendinger v. Forst Farms, Inc., 662 N.W.2d 546, 554 (Minn. Ct. App. 2003).

### a.  Statutory Duty

In what is often referred to as "negligence per se," a legislature may impose a duty and standard of care beyond those that exist generally.  See Anderson v. State, Dep't of Nat. Res., 693 N.W.2d 181, 189–90 (Minn. 2005).  However, "[f]or a statutory violation to satisfy the duty and breach elements, the person harmed by the violation must be among those the legislature intended to protect, and the harm must be of the type the legislature intended to prevent by enacting the statute."  Anderson, 693 N.W.2d at 190.  Negligence per se statutes are usually, if not always, meant to protect a class of persons from dangerous situations or activities.  See Seim v. Garavalia, 306 N.W.2d 806, 810 (Minn. 1981) ("Such statutes are often penal statutes that do not provide for a civil action.  The statute is said to express a policy for the protection of a certain class of persons." (collecting cases addressing negligence per se related to dangerous activities)).

Dunnigan's contention that Freddie Mac owed her a statutory duty under 12 U.S.C. §§ 4501(7) and 4565(b)(1) is without merit.  Congress did note Freddie Mac's "affirmative obligation to facilitate the financing of affordable housing for low- and moderate-income families in a manner consistent with their overall public purposes . . . ." 12 U.S.C.§ 4501(7).  However, there is no indication that Congress intended to protect a particular class of persons from a dangerous activity in doing so.  The statute is not a penal one, nor does it create any private cause of action against Freddie Mac.

Congress also charged Freddie Mac with a "duty" to "design programs and products that facilitate the use of assistance provided by the Federal Government and State and local governments," 12 U.S.C. § 4565(b)(1), like the refinancing program Dunnigan attempted to qualify for.  (See Compl. at ¶¶ 37–39.)  But again, there is no indication Congress meant to protect a class of persons from particular conduct, the statute is not penal, and it does not create any private right of action for a violation of this "duty."  Notably, Dunnigan cites no case, nor can the Court find one, that addresses a claim of negligence against Freddie Mac or Fannie Mae where the duty owed arose out of 12 U.S.C. §§ 4501(7) or 4565(b)(1).

### b.  Common Law Duty and Breach

Minnesota law imposes "a duty to act with reasonable care for the protection of others" in two instances:

> First, . . . general negligence law imposes a general duty of reasonable care when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff.  Second, a defendant owes a duty to protect a plaintiff when action by someone other than the defendant creates a foreseeable risk of harm to the plaintiff and the defendant and plaintiff stand in a special relationship.

Domagala, 805 N.W.2d at 23.  Dunnigan does not claim a special relationship between her and Freddie Mac and does not argue negligence based on Freddie Mac's nonfeasance (i.e., failure to protect against harm).  (Mem. in Opp. at 41.)  Thus, only the existence of a general duty of care is relevant.

"Under general concepts of tort law, 'duty' is defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct

toward another." L & H Airco, Inc. v. Rapistan Corp., 446 N.W.2d 372, 378 (Minn. 1989) (quotations omitted). "The essential question in determining whether a defendant owes a duty is whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Safeco Ins. Co. of Am. v. Dain Bosworth Inc., 531 N.W.2d 867, 871 (Minn. Ct. App. 1995) (quotations omitted). In Minnesota, "[l]enders owe no fiduciary duty to a borrower unless the 'bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.'" Kichler v. Wells Fargo Bank, N.A., No. 12-cv-1206 (JRT/AJB), 2013 WL 4050204, at *4 (D. Minn. Aug. 9, 2013) (quoting Klein v. First Edina Nat'l Bank, 196 N.W.2d 619, 623 (Minn. 1972)). With no fiduciary relationship (i.e., special relationship) between lenders and borrowers, courts routinely dismiss negligence and negligent misrepresentation claims brought by borrowers against lenders. See Roers v. Countrywide Home Loans, Inc., 728 F.3d 832, 838 (8th Cir. 2013) (affirming district court's dismissal of borrower's negligent misrepresentation claim and holding that in a typical borrower-lender relationship, lenders "owe[] no duty of care" to borrowers); Kichler, 2013 WL 4050204 at *4 (dismissing borrowers' negligent misrepresentation claim which alleged that the lender breached its common law duty to accurately disclose loan terms).

Dunnigan does not claim that she and Freddie Mac shared any sort of special relationship. Freddie Mac was not Dunnigan's lender.[12] Since whatever relationship

---

[12] Dunnigan claims that the fact that "a lender owes no fiduciary duty to a borrower is irrelevant," to the issue of Freddie Mac's supposed general duty of care because "[t]he

21

existed between Freddie Mac and Dunnigan was more attenuated than the relationship between Dunnigan and her lenders, and lenders owe no general duty of care to borrowers, the Court cannot conclude that Freddie Mac owed Dunnigan a duty of care to ensure that the LP Feedback Certificates were accurate.

### 3. Fraud

Freddie Mac argues that Dunnigan fails to state a claim for fraud.  (See Mem. in Supp. at 23–24; Reply at 16.)  Specifically, it contends that Dunnigan "cannot plausibly demonstrate that she relied to her detriment on [Freddie Mac's alleged misrepresentations] and that she suffered pecuniary damages as a result of her reliance." (Mem. in Supp. at 23.)  The Court finds that Dunnigan's fraud claim suffers from a more fundamental fatal flaw.

In Minnesota, a claim for fraudulent misrepresentation requires:

(1) a false representation by [the defendant] of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [the plaintiff] to act in reliance thereon; (4) that the representation caused [the plaintiff] to act in reliance thereon; and (5) that [the plaintiff] suffered pecuniary damages as a result of the reliance.

---

duties of borrower and lender are defined by contract."  (See Mem. in Opp. at 42, n.14.) Dunnigan misses the point with this argument.  The important and very relevant issue is that lenders owe no general duty of care to borrowers under Minnesota negligence law. See Roers, 728 F.3d at 838.  Presumably as a result of this fact, borrowers and lenders sometimes enter into contracts that obligate lenders, by virtue of the contract and *not* because of a common law duty of care, to perform certain tasks or to employ a particular standard of care.  See Berger v. Nationstar Mortgage LLC, 118 F. Supp. 3d 1121, 1125–27 (D. Minn. 2015) (dismissing the plaintiff's negligence claim because the defendant did not have a common law duty to transfer the plaintiff's mortgage with reasonable care and the parties' relationship was instead governed entirely by the contract between them).

Valspar Refinish, Inc. v. Gaylord's, Inc., 764 N.W.2d 359, 368 (Minn. 2009). A party's reliance is "generally evaluated in the context of the aggrieved party's intelligence, experience, and opportunity to investigate the facts at issue." Valspar Refinish, 764 N.W.2d at 369. Pecuniary (i.e., money) damages are an essential element of fraud. Nodland v. Chirpich, 240 N.W.2d 513, 517 (Minn. 1976). Claims of fraud must be pled with particularity, see Fed. R. Civ. P. 9(b), but on a motion to dismiss, general allegations of reliance and damages are enough, see Franklin High Yield Tax-Free Income Fund v. Cty. of Martin, Minn., 152 F.3d 736, 740–41 (8th Cir. 1998) (a plaintiff's allegations that it relied on the misrepresentation of the defendant when purchasing bonds, would not have purchased the bonds otherwise, and suffered damages in the form of purchasing the bonds at an inflated price was sufficient to survive a motion to dismiss).

Dunnigan alleges that she relied on Freddie Mac's misrepresentations to her and to her lenders that Equifax's reporting was the "cause" of the negative Feedback Certificates. (See Compl. at ¶¶ 102–04.) She also contends that neither Freddie Mac nor Equifax would provide her with what Equifax was reporting to Freddie Mac. (Id. at ¶ 95.) Easily inferred is the claim that Dunnigan had little choice but to rely on what Freddie Mac told her about the cause of the negative Feedback Certificates because she had no means to independently investigate the issue. This is enough to sufficiently plead reasonable reliance.

Based on this reliance, Dunnigan claims she "spent time, effort, and *money* lodging a complaint against Equifax with the Minnesota Attorney General." (Id. at ¶ 103

(emphasis added).)   She also filed a civil law suit against Equifax.   (Id. at ¶ 104.)

Presumably, filing that civil suit cost money (e.g., filing fees, attorney's fees, etc.).

Dunnigan also generally alleges she incurred "out-of-pocket expenses" as a result of

Freddie Mac's misrepresentations.   (Id. at ¶¶ 106, 131.)   Again, this is enough to survive

a motion to dismiss.   Martino-Catt v. E.I. duPont de Nemours & Co., 213 F.R.D. 308,

323 (S.D. Iowa 2003) ("At the pleading stage, a plaintiff need not specify an actual

amount of damages or the precise basis on which damages should be determined.   A

general allegation of damages and causation, such as the Complaint here alleges, is

enough.   While [the plaintiff's] failure to plead the specific amount of her alleged losses

weakens her fraud allegations, it is not itself a pleading deficiency." (citations omitted)).

However, the Court finds that Dunnigan's fraud claim suffers from a more

fundamental deficiency.   In order to provide the notice required under Rule 9(b), a

plaintiff must plead "the who, what, when, where, and how: the first paragraph of any

newspaper story."   Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011).

"Conclusory allegations that a defendant's conduct was fraudulent and deceptive are not

sufficient to satisfy [Rule 9(b)].   BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908,

917 (8th Cir. 2007).   "Although Rule 9(b) allows '[m]alice, intent, knowledge, and other

conditions of a person's mind' to be 'alleged generally,' this does not mean a plaintiff

may base a fraud claim on 'speculation and conclusory allegations.'   Instead, plaintiffs

must 'allege facts that give rise to a strong inference of fraudulent intent.'"   Cmty. Voice

Line, LLC v. Great Lakes Commc'n Corp., 295 F.R.D. 313, 322 (N.D. Iowa 2013), aff'd

24

sub nom. Cmty. Voice Line, L.L.C. v. Great Lakes Commc'n Corp., No. C 12-4048-MWB, 2014 WL 272646 (N.D. Iowa Jan. 23, 2014) (quoting Brown v. N. Cent. F.S., Inc., 987 F. Supp. 1150, 1156 (N.D. Iowa 1997)).

Dunnigan contends that by September 6, 2013, "Freddie Mac knew" that its allegedly erroneous Feedback Certificates were the result of the LP software.  (Compl. at ¶ 88.)  She also claims that "Freddie Mac intended that [Dunnigan] would rely on its false representations," about the cause of the allegedly erroneous Feedback Certificates, (id. at ¶ 101), and that its misrepresentations to her "were intentional and malicious," (id. at ¶ 150).   However, besides Dunnigan's conclusory statements, she points to no specific facts that show Freddie Mac's intent to mislead her, maliciousness in doing so, or how/why Freddie Mac knew about the cause of the allegedly erroneous Feedback Certificates.   At most, what Dunnigan alleges supports a claim that Freddie Mac was incompetent in addressing her concerns about the erroneous Feedback Certificates. Because it is plausible that Dunnigan could amend her claim to address these deficiencies, the Court dismisses her fraud claim without prejudice.

## III.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1. Federal Home Loan Mortgage Corporation d/b/a Freddie Mac's ("Freddie Mac") Motion to Dismiss [Doc. No. 25] is **GRANTED IN PART AND DENIED IN PART** as follows:

a. Plaintiff Julie M. Dunnigan's ("Dunnigan") claims for negligence (Count IV) and negligent misrepresentation (Count VI) [Doc. No. 51] are **dismissed with prejudice**;

b. Dunnigan's fraud claim (Count V) is **dismissed without prejudice**;

c. Freddie Mac's Motion to Dismiss is otherwise **denied without prejudice**.


Dated:  April 27, 2016                    s/ Susan Richard Nelson
                                          SUSAN RICHARD NELSON
                                          United States District Judge