UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


JULIE M. DUNNIGAN,                          CIVIL NO. 15-2626 (SRN/JSM)

     Plaintiff,

v.                                          REPORT AND RECOMMENDATION

FEDERAL HOME LOAN CORPORATION,
*d/b/a Freddie Mac*,

     Defendant.


The above matter came before the undersigned on the motion of plaintiff Julie M. Dunnigan for attorney's fees [Docket No. 71] and a request by plaintiff that the redacted portions of her Reply brief, along with two exhibits filed by her in connection with her Reply, be unsealed.

This matter was referred by the District Court to the undersigned United States Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(B) and Local Rule 72.1(c) [Docket No. 73].

I.     **MOTION FOR ATTORNEY'S FEES**

    A.     **Background**

The facts relevant to the instant motion are as follows.  Plaintiff Julie Dunnigan sued the Federal Home Loan Mortgage Corporation ("Freddie Mac") alleging that in July of 2013, Freddie Mac, through its Loan Prospector system, erroneously placed her mortgage loan with M & T Bank in the category for 90-day mortgage delinquencies in the past 12 months, and then repeatedly issued a "Caution" Certificate for the Risk Class in the Feedback Certificates that Freddie Mac communicated to numerous loan

originators.  Third Amended Complaint ("TAC"), ¶¶ 50, 56, 85, 89-91. [Docket No. 63].

Likewise, Freddie Mac, through its Loan Prospector system, erroneously placed another

mortgage account belonging to Dunnigan with Wells Fargo Home Mortgage in the same

category and issued a "Caution" Certificate for various loan applications in 2011 and

2012.  Id., ¶¶ 128, 131, 142.  As a result of these erroneous reports, Dunnigan was

unable to obtain a mortgage to refinance her home during the period of 2011 through

2013.  Id., ¶¶ 89-91, 94, 145.  According to Dunnigan, when she was investigating the

source of M & T Bank's reporting error, Freddie Mac representatives told her that

Equifax had erroneously reported the delinquencies, it had notified Equifax of the

problem, and Equifax would not fix its error.  Id., ¶¶ 70, 79, 100, 113, 120.  Dunnigan

ultimately sued Equifax for its erroneous reporting.  See Dunnigan v. Equifax

Information Servs., LLC, Civ. No. 14-701 (JNE/SER) Complaint [Docket No. 1] ("Equifax

Suit").  Dunnigan and Equifax settled and that lawsuit was dismissed with prejudice on

July 10, 2015.  [Equifax Suit, Docket Nos. 24, 25].

On June 2, 2015, Dunnigan filed the instant lawsuit, initially alleging two counts

of violations of the Fair Credit Reporting Act ("FCRA").  Complaint [Docket No. 1].  Over

the course of the suit, Dunnigan amended the complaint three times.  By the Third

Amended Complaint, Dunnigan had asserted the two counts of violations of the FCRA

and several other counts asserting state claims of defamation, fraud, reckless

misrepresentation and intentional infliction of emotional distress.  TAC, ¶¶ 153-178.

Dunnigan's fraud and reckless misrepresentation claims were based on allegedly

intentional misrepresentations by Freddie Mac to her that Equifax, and not Freddie Mac,

was the source of the reporting delinquencies on her M & T account.  Id., ¶¶ 167-173.

Dunnigan sought out-of-pocket expenses, among other types of damages she had suffered as a consequence of Freddie Mac's conduct.  Id., ¶¶ 154, 159, 165, 169, 173.

On September 2, 2016, Freddie Mac made a Rule 68 Offer of Judgment, which Dunnigan accepted on September 6, 2016.   Notice of Acceptance of Defendant's Rule 68 Offer of Judgment [Docket No. 69].  Freddie Mac's Offer of Judgment was for $75,000 and included "an additional amount for Plaintiff's reasonable attorneys' fees and costs, in an amount to be determined by the Court."  Id., p. 4.  Further, the Offer of Judgment stated that it did "not constitute an admission of liability or wrongdoing by Freddie Mac regarding Plaintiff's claims against Freddie Mac or otherwise."  Id., p. 2.

Pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure and Local Rule 54.3(b),[1]  15 U.S.C. §§ 1681n(a)(3) and 1681o(a)(2),[2] the Rule 68 Offer of

---

[1]     Rule 54(d)(2) and Local Rule 54.3(b) provide the procedure for moving for an award of attorney's fees and costs.

[2]     These statutes provide as follows:

15 U.S.C. § 1681n(a)(3) states:

> (a) In general
>
> Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
>
> ***
>> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681o(a)(2) states:

> (a) In general

Judgment, and the Court's September 12, 2016, Judgment [Docket No. 70], Dunnigan moved the Court for an Order awarding reasonable attorney's fees. Plaintiff's Motion for Reasonable Attorney's Fees and Related Nontaxable Expenses ("Motion for Fees") [Docket No. 71]; Plaintiff's Reply Memorandum of Law in Support of Motion for Reasonable Attorney's Fees ("Pl.'s Reply) [Docket No. 87]. Dunnigan initially moved for an award of fees and related nontaxable expenses of $207,297.87. Motion for Fees, p. 1. This amount included $193,754.17 in fees "to date;" and estimated additional $2,100 in fees for briefing and assembling documents for the motion, a 5% upward enhancement, and $1,651.00 in costs.[3]  Id.  Plaintiff stated that "[t]he precise total amount will be determined after briefing and any hearing on the matter."  Id.  In her Memorandum of Law, Dunnigan claimed a base lodestar amount of $198,773.33 plus a 5% upward adjustment for a total award of $208,711.99.  See Pl.'s Mem., pp. 1-2. Dunnigan then sought an additional $6,370.00 for time spent preparing her reply to Freddie Mac's brief in opposition to the instant motion.  Pl.'s Reply, p. 8; Second Declaration of John Goolsby ("Goolsby Decl. II"), Ex. C [Docket Nos. 87, 88, 88-3]. Dunnigan also requested an additional $21,350.00 for work completed on the state tort claims in the event the Court accepted Freddie Mac's argument that fees were to be

---

> Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
>
> ***
>
> > (2) In the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

[3]    Ultimately, Dunnigan dropped her claim for costs.

awarded based on a contractual obligation arising out of the Offer of Judgment and not based on the statute.  Pl.'s Reply, p. 8.  In other words, Dunnigan argued that if the Court accepted Freddie Mac's contention regarding the source of her fee award, then she was entitled to even more fees because in the initial round of briefing she had eliminated any claim for fees based on work performed in connection with the tort claims.  Id.

In summary, without enhancement, Dunnigan requested a base award of fees in the amount of $205,143.33 related to her FCRA claims, and alternatively, the sum of $226,493.33, if the Court determined that she was entitled to fees for work done on her tort counts.

In connection with her motion for fees, Dunnigan asked for compensation at the rate of $350 per hour for attorney work, and $100 per hour for services that was performed by her attorney, John Goolsby, that she recognized could have been done by a paralegal.  Plaintiff's Memorandum of Law in Support of Motion for Reasonable Attorney's Fees ("Pl.'s Mem.") [Docket No. 75], pp. 8-12.  Goolsby indicated that he had 14 years of experience and had focused his practice almost entirely on FCRA cases since 2007.  Id., pp. 8-9 (citing Declaration of John Goolsby ("Goolsby Decl."), ¶ 4 [Docket No. 76].  Dunnigan asserted that the hourly rate charged for Goolsby's services and the number of hours expended by him were reasonable because litigating FCRA claims against Freddie Mac is very complex, difficult and time-consuming, and particularly, when the case involved novel and difficult questions, including whether Freddie Mac was a consumer reporting agency and subject to the FCRA.  Pl's. Mem., pp. 9-12; Goolsby Decl., ¶¶ 21, 23.  Dunnigan submitted that she had sought "in excess

of $60,000" for economic damages, (citing Goolsby Decl., ¶ 25), and therefore, the settlement of $75,000 "was not only enough to cover all of the claimed economic damages, but also reflect[ed] an additional amount for non-economic damages, i.e. punitive damages and/or emotional damages." Pl.'s Mem. p. 11.

Dunnigan also maintained that she was entitled to an award of fees for time spent not only on the instant case, but on the Equifax suit, as well. Id., pp. 13-16. Dunnigan sought attorney's fees totaling $45,524.17 in connection with Goolsby's work on the Equifax Suit, representing 125.47 hours at $350 per hour and 15 hours of paralegal time at $100 per hour. Goolsby Decl., Ex. B (categories labeled 1-16). Dunnigan argued that Goolsby's work on the Equifax Suit was vital and formed the basis of her claims in the instant case because it was the evidence uncovered in discovery in the Equifax Suit that showed that Freddie Mac, and not Equifax, was the source of the delinquency reporting. Pl.'s Mem., pp. 14-15; Goolsby Decl., ¶¶ 11, 16, 21. Further, Dunnigan relied "substantially" on information obtained in discovery in the Equifax Suit to draft pleadings, to develop her own discovery, to respond to discovery, and to support her settlement demands in the instant case. Id., ¶¶ 17-20. According to Dunnigan, the Eighth Circuit has affirmed an award of attorney's fees for work on a prior legal action when the work involved was needed for a successful outcome in a subsequent case. Pl.'s Mem., p. 13 (citing Bobbitt v. Paramount Cap Mfg. Co., 942 F.2d 512 (8th Cir. 1991) (citing McDonald v. Armonstrout, 860 F.2d 1456, 1461-62 (8th Cir. 1988)); Perkins v. Cross, 728 F.2d 1099 (8th Cir. 1984)). Moreover, the Rule 68 Offer of Judgment by Freddie Mac was not limited to attorney's fees in the instant case and that before making the Offer of Judgment, Dunnigan had put Freddie Mac on notice

that she was claiming both economic damages in excess of $60,000 and attorney's fees for the instant case and the Equifax Suit.  Id., pp. 15-16 (citing Goolsby Decl., ¶ 25).

As for her attorney's work on the instant case, Dunnigan sought $153,249.17 in fees representing 452.53 hours at $350 per hour and approximately 11 hours at $100 per hour, plus the additional fees of $6,370.00 for the reply brief.  Goolsby Decl., Ex. B (categories labeled 17-34); Goolsby Decl. II, Ex. C.  These amounts represented already-taken reductions by Goolsby.  Goolsby Decl., ¶¶ 30, 34.

Dunnigan also asserted that a 5% "enhancement" to the fees was appropriate when the payment of fees is subject to "unanticipated delay, particularly where the delay is unjustifiably caused by the defense," or "where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value, as demonstrated in part during the litigation."   Pl.'s Mem., p. 16 (quoting Perdue v. Kenny A ex rel. Winn, 559 U.S. 542, 554-56 (2010)).  Dunnigan claimed that due to Freddie Mac's misrepresentations, there was a delay of 17 months before she learned that Freddie Mac, and not Equifax, was the source of the delinquency reporting.  Id. (citing Dunnigan Decl., ¶ 5; Goolsby Decl., ¶ 15).  Dunnigan multiplied the current prime interest rate of 3.5% by 1.42 years (17 months) and claimed that the resulting 5% was a reasonable enhancement.  Id., p. 17.

In response, Freddie Mac maintained that the fees sought by Dunnigan were excessive; much of the work performed was unwarranted or could have been performed by a legal assistant or paralegal; counsel's hourly rate was not justified for all the tasks for which he billed; and Dunnigan was not entitled to an upward adjustment of the fees.

Defendant's Memorandum in Opposition to Motion for Fees ("Def.'s Opp. Mem."), p. 5 [Docket No. 84].[4]

As for the fees incurred in connection with the Equifax Suit, Freddie Mac argued that Dunnigan relied on general and unsupported statements that the suit was necessary for her to prevail in the instant matter, and yet she had failed to explain specifically how the fees generated in the that lawsuit were relevant to the instant suit, apart from conclusory statements. Id., p. 7.   Further, Bobbitt and Perkins, cited by Dunnigan in support of her claim that Freddie Mac should pay the fees that she had incurred in the Equifax Suit, were distinguishable because those cases involved fees incurred in prior proceedings involving the same claims against the same parties. Id., pp. 7-8.  At any rate, even if Dunnigan could establish the relevance of the legal work performed in the Equifax Suit, she was not entitled to fees incurred in that case because they were precluded by the terms of the Offer of Judgment.  According to Freddie Mac, the Offer of Judgment is governed by contract principles and thus, when a party "invokes a contractual right to attorney fees, the underlying contracts control fee liability."  Id., pp. 8-9 (quoting Best Buy Stores v. Developers Diversified Realty Corp., 2011 WL 1321391, at *4 (D. Minn. Feb. 1, 2011); also citing Bores v. Domino's Pizza LLC, Civ. No. 05-2498, 2008 WL 4755834, at *7 (D. Minn. Oct. 27, 2008) (declining to award attorneys' fees based on franchise agreement for tasks "that have no obvious connection to this case")).  In this regard, Freddie Mac posited:

> Like Best Buy Stores, the scope of the fees and costs recoverable in the present matter is governed by contract— namely, the Offer of Judgment—which provided for entry of

---

[4]    Freddie Mac did not number the pages of its memorandum.  Consequently, the Court cites the page numbers assigned through the Court's CM/ECF system.

judgment to "include an additional amount for Plaintiff's reasonable attorneys' fees and costs" in exchange for "total settlement of any and all claims by Plaintiff against Freddie Mac." There is no basis to conclude that this language contemplated that Dunnigan could recover for attorney's fees incurred by Ms. Dunnigan in her separate and distinct lawsuit against a different defendant, Equifax, to which Freddie Mac was not a party and for which Ms. Dunnigan has already received a monetary settlement from Equifax. Ms. Dunnigan presumably could have recovered her attorney's fees for the Equifax litigation from Equifax.

Id., p. 9.

Freddie Mac also submitted that Dunnigan was seeking reimbursement for grossly excessive hours. Id., pp. 10-13. Freddie Mac objected to 75 hours that Goolsby expended for drafting an opposition to Freddie Mac's first motion to dismiss, noting that 29 of these hours were improperly block billed with the time spent on the drafting of the Amended Complaint; 40 hours were billed after the parties stipulated to extend the deadline for Dunnigan to file an Amended Complaint; and 30 hours were billed after the Amended Complaint was filed and rendered the motion to dismiss moot. Id., pp. 10-11 (citations omitted). Freddie Mac further noted that Goolsby billed another 22 hours drafting Dunnigan's opposition to Freddie Mac's second motion to dismiss, despite the fact that her opposition briefs for the two motions were largely the same. Id., p. 11. Freddie Mac objected that 98.6 hours (translating to almost $35,000 in fees) drafting oppositions to its motions to dismiss was grossly excessive. Id. Similarly excessive were the 150 hours (representing more than $50,000 in fees) spent on routine discovery during which no depositions were taken. Id., pp. 11-12. By way of example of overbilling, Freddie Mac pointed to 9 hours spent responding to a Rule 37 deficiency

letter; 6 hours spent drafting a Rule 30(b)(6) deposition notice, and 11 hours billed for a routine Rule 26(f) report.  Id.

Freddie Mac additionally argued that some of the work that Goolsby performed was unnecessary and Dunnigan's fee request should be reduced accordingly.  Id., pp. 12-14.  For example, Goolsby billed 10 hours for preparing for depositions that were never taken; 7 hours for drafting a response to an "anticipated" summary judgment motion that Freddie Mac never filed; time spent preparing Dunnigan's own summary judgment motion, which was premature and was never brought; and 8 hours drafting motions to compel, even though Dunnigan never filed a motion to compel.  Id., p. 13.  Additionally, 8 hours of Goolsby's time should be disallowed because it represented clerical tasks such as indexing documents, updating spreadsheets and tracking down documents.  Id., p. 14.

Freddie Mac objected to Goolsby's hourly rate of $350 for all tasks performed by Goolsby.  Id., pp. 14-19.  Freddie Mac claimed that Goolsby should have charged less than this amount when performing routine tasks and faulted him for not employing a less expensive associate attorney, paralegal or law student to perform some of the tasks that did not merit his alleged expertise.  Id., p. 16.  According to Freddie Mac these tasks included numerous and excessive hours spent drafting "poorly written discovery requests," drafting unnecessary motions to compel and an opposition to an obsolete motion to dismiss, preparing a simple Rule 26(f) statement and a Rule 30(b)(6) notice, and indexing files.  Id.  According to Freddie Mac, these billings made it clear that either Goolsby was not the "expert" he purported to be, or he was needlessly generating hours that resulted in unreasonable and wasteful fees.  Id., p. 17.

Lastly, Freddie Mac opposed Dunnigan's request for a 5% upward adjustment. Id., pp. 17-18.  Upward adjustments to an attorney's hourly rate are permissible in rare and exceptional cases and only when supported by specific evidence and detailed findings.  Id. (citing Forshee v. Waterloo Indust., Inc., 178 F.3d 527, 532 (8th Cir. 1999) (citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986)).  Here, there was no basis for characterizing the litigation of the instant suit as "rare" or "exceptional."  Id., p. 18.  Freddie Mac also urged the Court to reject Dunnigan's argument that she was entitled to an enhancement based on Freddie Mac's alleged delay of her case, noting that her assertion that it was Freddie Mac which had conveyed the false information about Equifax reporting that she was delinquent in her mortgage payments, was nothing more than an allegation that Freddie Mac has always denied.  Id..

Freddie Mac did not identify the dollar amount of fees it believed were appropriate, but instead submitted a mark-up of one of Dunnigan's exhibits (Goolsby Decl., Ex. D) with billing entries highlighted that it believed should be disallowed because: (1) the fees related to the Equifax Suit; (2) were excessive; (3) were for unnecessary or premature work; and (4) were clerical.  Freddie Mac Appendix [Docket No. 84-2].

Dunnigan replied that Goolsby's hourly rate was reasonable and the work performed in the Equifax Suit was necessary to advance the litigation to the point at which Freddie Mac made its Offer of Judgment.  Pl.'s Reply, pp. 1-2.  According to Dunnigan, Freddie Mac's attempt to distinguish Bobbitt and Perkins should be rejected, as contrary to Freddie Mac's description of these cases, they did not involve identical

parties or claims.  Id., pp. 2-3.  Further, Freddie Mac should not be allowed, on the one hand, to claim that Dunnigan was only entitled to one fact deposition in the current case, "because Plaintiff has already taken the depositions of four Freddie Mac representatives" in the Equifax Suit, while simultaneously asserting that the Equifax Suit was "totally distinct" from the instant case.  Id., p. 3 (quoting Rule 26(f) Report and Def.'s Opp. Mem., p. 1).  Moreover, it was from the documents that she had obtained in the Equifax Suit that Dunnigan learned the identities of the relevant Freddie Mac witnesses to depose, and had she not deposed those individuals in the Equifax Suit, she would have had to take them in the current suit.  Id.  Additionally, the work in the Equifax Suit was essential to the instant case because it was through the depositions that Dunnigan took in the Equifax Suit that she learned about Freddie Mac's internal systems that generated a report of recent delinquencies on her payments.  Id., (citing Goolsby Decl. II, Exs. A and B (excerpts from Freddie Mac witnesses Shawn Martin and April Stull).

Dunnigan also maintained that even if the Offer of Judgment created a contractual obligation regarding fees, as Freddie Mac maintained, then she was entitled to more fees, not less fees, because contractual fees were in addition to and not in lieu of statutory fees.  Id., pp. 3-4 (citations omitted).  Stated otherwise, if Freddie Mac's theory was that the Offer of Judgment created a contractual liability for fees independent of the fee-shifting statute, then Dunnigan was entitled to fees incurred for work performed not only on her claims under the FCRA, but also on her tort claims ($21,350).  Id., p. 4 (citing Goolsby Decl. Ex. D, category labeled 31; other citations omitted.).  Alternatively, Dunnigan contended that as the Offer of Judgment did not

exclude pre-suit fees, it could be reasonably construed to include fees for all work relevant to the successful prosecution of the claims, including work performed in the Equifax Suit.  Id. (citation omitted).

Finally, Dunnigan asserted that the fees she sought were not excessive as nothing about this case was "routine" and in fact, some of the fees were incurred because of Freddie Mac's litigation conduct.  Id., pp. 5-6 (citing Freddie Mac's conduct with respect to identification of witnesses in its Rule 26(a) disclosures, Freddie Mac's failure to advise Dunnigan that it was going to withdraw its first motion to dismiss, and Freddie Mac's change of position regarding number of fact depositions and ESI).  According to Dunnigan, "the only reason so much additional time was needed in the second case was the vigor of Freddie Mac's defense."  Id., p. 6.  As to drafting a response to a summary judgment that Freddie Mac never brought, or the drafting of her own motion for summary judgment, Dunnigan claimed that this work was "responsible and reasonable" because Freddie Mac "repeatedly vowed to move for summary judgment" and her lawyer had no idea when the motion would be served, so he "responsibly began to prepare."  Id., p. 7.

### B.   Analysis and Decision

The most useful starting point for determining the amount of a reasonable fee is the number of hours expended on the litigation multiplied by a reasonable hourly rate. Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); see also Gumbhir v. Curators of the Univ. of Mo., 157 F.3d 1141, 1146 (8th Cir. 1998) (citations omitted); Transclean Corp. v. Bridgewood Serv., Inc., 134 F. Supp. 2d 1049, 1052 (D. Minn. 2001).  This approach is commonly known as the lodestar method.  "Under a fee-shifting statute such as the

FCRA . . . the lodestar method is generally the correct method for calculating attorney's fees." Yeagley v. Wells Fargo & Co., 365 Fed. Appx. 886 (9th Cir. 2010).

"Under the lodestar method, the Court determines the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Young v. Diversified Consultants, Inc., 554 F. Supp. 2d 954, 956 (D. Minn. 2008) (quoting Hensley, 461 U.S. at 433). A reasonable hourly rate is usually the ordinary rate for similar work in the community where the case has been litigated. Emery v. Hunt, 272 F.3d 1042, 1048 (8th Cir. 2001); McDonald v. Armentrout, 860 F.2d 1456, 1458-59 (8th Cir. 1988) ("Requested rates should be in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.") (quoting Blum v. Stenson, 465 U.S. 886, 895 n. 11 (1984)). Once a lodestar amount is determined, the Court may then consider other factors such as those described in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974) to increase or decrease the lodestar amount, if appropriate. Hensley, 461 U.S. at 434; Gopher Oil Co., Inc. v. Union Oil Co. of Cal., 757 F. Supp. 998, 1009 (D. Minn. 1991) (citation omitted). These factors include:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Hensley, 461 U.S. at 430 n.3 (citing Johnson, 488 F.2d at 717-19)..

Even though the <u>Johnson</u> factors may be used to increase or decrease the lodestar amount, "many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." <u>Hensley</u>, 461 U.S. at 434 n.9 (citation omitted).   In short, the "assessment of a fee's reasonableness includes consideration of 'the plaintiff's overall success; the necessity and usefulness of the plaintiff's activity in the particular matter for which fees are requested; and the efficiency with which the plaintiff's attorneys conducted that activity.'" <u>Wal-Mart Stores, Inc. v. Barton</u>, 223 F.3d 770, 772 (8th Cir. 2000) (quoting <u>Jenkins by Jenkins v. Missouri</u>, 127 F.3d 709, 718 (8th Cir. 1997)).   Conversely, hours may be reduced by the court where documentation of the hours is inadequate, if the case was overstaffed, or if the "hours are excessive, redundant or otherwise unnecessary." <u>Hensley</u>, 461 U.S. at 433-34; <u>see also El-Tabech v. Clarke</u>, 616 F.3d 834, 842 (8th Cir. 2010) (A court must exclude "hours that are excessive, redundant, or otherwise unnecessary.") (citation omitted).   The fee applicant bears the burden to produce evidence to support the rates charged and hours worked.  <u>Hensley</u>, 461 U.S. at 433; <u>see also Philipp v. ANR Freight Sys., Inc.</u>, 61 F.3d 669, 675 (8th Cir. 1995) (The party seeking fees "bears the burden of establishing an accurate and reliable factual basis for an award of attorney's fees….").

Before beginning its analysis of Dunnigan's fee petition, the Court makes the following general observations and judgments. First, this matter was settled through an Offer of Judgment with no admission of any liability or wrongdoing by Freddie Mac. <u>See</u> Offer of Judgment.  Therefore, to the extent that Dunnigan's arguments are premised on the suggestion that the magnitude of the fees she is seeking is justified by any alleged

wrongdoing by Freddie Mac, (see e.g. Pl.'s Mem., pp. 2, 3, 16), that position is meritless.   Similarly, the Court will not recommend fees based on Freddie Mac's supposed misconduct in discovery.   See Pl.'s Mem., p. 5; Pl's Reply, pp. 5-6.   There has never been a judicial finding that Freddie Mac violated any statute or wrongly resisted discovery and in fact, Dunnigan never brought a motion to compel.

Second, the Court found many of Goolsby's billing descriptions grossly inadequate for the purpose of analyzing, much less awarding reasonable fees.   For example, Goolsby's billing records are replete with entries such as "phone client," "email client," "respond disco," "amended disco responses," "disco to FM."   Goolsby Decl., Ex. D.   Based on such vague entries, the Court could not determine whether the time billed was appropriate or not.   At the end of the day, it was Dunnigan's burden to provide the Court with a factual basis for the fee award.   See Philipp , 61 F.3d at 675 (the party seeking fees "bears the burden of establishing an accurate and reliable factual basis for an award of attorney's fees. . . .").   Having chosen to submit billing records that are so imprecise, Dunnigan must live with the consequences of that choice.

Third, the Court has considered the parties' arguments regarding the source of the award – whether it is the attorney's fees-shifting provisions of 15 U.S.C. § 1681n(a)(3) and o(a)(2) or Freddie Mac's Offer of Judgment – and Dunnigan's corollary argument that she should receive an award for attorney's fees associated with the time spent pursuing her tort claims ($21,350).   Both provisions of 15 U.S.C. § 1681 direct that attorney's fees should be awarded by the Court to the consumer for "any successful action to enforce liability under this section."   This Court could locate no cases within the Eighth Circuit interpreting this language in the context of an Offer of

Judgment that expressly disavowed liability on the part of the settling defendant. However, a few courts have concluded that a plaintiff is "successful" for the purpose of the statutory fee-shifting provisions of the FCRA even if the litigation results in a settlement because the settlement "fixes liability" by the defendant.   Cooper v. Verifications, Inc., Civ. No. 04-0385, 2008 WL 5332190, at *9 (N.D. Ind. Dec. 18, 2008) (attorney's fee provision of the FCRA may be triggered by Offer of Judgment); Hall v. Harleysville Ins. Co., 943 F.Supp. 536, 540, n.3 (E.D. Pa. 1996) (same).

The Court concluded that it was not necessary to decide whether it is the fee-shifting provisions of the FCRA or contract law which governs the fee award.  Instead of including any claim for attorney's fees within the $75,000 offer of judgment, Freddie Mac made the offer to Dunnigan for this sum plus an additional amount of reasonable fees and costs to be determined by the Court.  The only substantive source for an award of attorney's fees is the FCRA.  Dunnigan has identified no source for an award of attorney's fees associated with her tort claims.  Thus, the Court rejects any contention by Dunnigan that Freddie Mac should be assessed attorney's fees incurred by her in connection with the tort claims she has alleged.

Fourth, the Court will not exclude from its award of attorney's fees all fees associated with the Equifax Suit ($45,524.17) simply because they were incurred in a prior action.  While it is true that Dunnigan had the opportunity to seek (and perhaps did) attorney's fees in connection with her settlement of the Equifax Suit, that theoretical possibility does not preclude her from seeking an award of fees for work performed in that litigation if that proceeding proved directly relevant to the successful prosecution of the instant suit.  See Bobbitt, 942 F.2d at 514 ("An attorney's work done in connection

17

with administrative proceedings is compensable under § 2000e–5(k) if the work product from the administrative proceedings was 'both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement.'") (quoting Webb v. Bd. of Educ. of Dyer Cty., Tenn., 471 U.S. 234, 243 (1985); McDonald, 860 F.2d at 1462 ("Section 1988 does not limit fee awards to work performed after the complaint is filed, but allows recovery of fees for time spent beforehand investigating facts and researching the viability of potential legal claims.") (citing Webb, 471 U.S. at 250); Perkins, 728 F.2d at 1100 ("[N]o fees should be awarded for any time the lawyer spent defending the appellants in the original municipal court proceeding, except to the extent, if any, that research or investigation done in connection with that proceeding proved directly relevant to the successful prosecution of the later civil rights claims of those two appellants who received nominal damages in the district court.").

As the Eighth Circuit stated in McDonald:

> As did Plaintiffs here, the petitioner in the habeas action alleged that living conditions on Missouri's death row were unconstitutional. The habeas petitioner is himself a named plaintiff in the present suit. Preparations for that action were precisely what was needed for this one: tours of death row, reviews of prison records, consultations with experts and other attorneys, and research of applicable law. Such work was "both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement." Webb, 471 U.S. at 243, 105 S.Ct. at 1928 (suggesting that prevailing civil rights litigant under § 1988 may be awarded fees for a "discrete portion" of work in a related optional state administrative proceeding to the extent such work was "useful and of a type ordinarily necessary" to the successful outcome of the subsequent litigation). Indeed, work for the habeas action "obviated the need for comparable work in" this proceeding, and "contributed directly to [its] successful outcome." See Webb, 471 U.S. at 249-50, 105 S.Ct. at 1931-32 (Brennan, J., concurring in part and dissenting in part).

860 F.2d at 1462.

And as the Eighth Circuit explained in <u>Bobbitt</u>:

> An investigation of whether Bobbitt was constructively discharged in the civil rights context would have involved the same gathering of evidence that was performed by Bobbitt's attorneys to prepare for the [Missouri Division of Employment Security (MoDES)] proceeding. Because the attorneys' work in preparing for the MoDES proceeding was "useful and substituted for work at the judicial stage that would have been ordinarily necessary to a successful outcome" of Bobbitt's civil rights claims, the $7201.00 of attorneys' fees that accrued prior to and during the MoDES proceedings is compensable. Webb, 471 U.S. at 254, 105 S.Ct. at 1934 (internal quotations omitted) (Brennan, J., concurring in part, dissenting in part).

942 F.2d at 514 (quoting <u>Webb</u>, 471 U.S. at 254).

The fact that <u>Hensley</u>, <u>Webb</u>, <u>Bobbitt</u> and <u>McDonald</u> all were civil rights cases seeking an award of attorney's fees under 42 U.S.C. § 1988, does not prevent this Court from applying the same rationale in those cases to a suit arising under the FCRA. Indeed, as the Supreme Court recognized in <u>Hensley</u>, § 1988 "was drafted based on Congress's experience with over 50 fee-shifting provisions in other statutes, dating back to Reconstruction-era civil rights statutes."  461 U.S. 444, n.3 (citing Senate Report 3–4; <u>Alyeska Pipeline Co. v. Wilderness Society</u>, 421 U.S. 240, 260, n. 33 (1975)).  <u>Hensley</u> and it progeny have been applied in fee applications arising under many different statutes and the Court sees no reason not to apply it here.  Likewise, none of these cases required, as argued by Freddie Mac, that the claims and parties be identical

between the Equifax Suit and the instant suit, and in fact, in <u>Webb</u>, <u>Perkins</u>, <u>McDonald</u>, and <u>Bobbitt</u>, the parties or claims were not the same.[5]

Further, the Offer of Judgment did not contain any provision excluding an award of fees for work performed in the Equifax Suit.

That said, while the Court will not categorically exclude all work performed by Goolsby in the Equifax Suit from the award of fees in this suit, at the same time, the Court will not blindly accept that all of work performed in the Equifax Suit should be assessed against Freddie Mac in the instant case.  The Court will carefully examine the descriptions of the services performed in the Equifax Suit to determine if they were relevant to the successful prosecution of the instant suit.

---

[5]     In <u>Webb</u>, the administrative proceeding by Webb was against the Dyer County Board of Education in which he claimed his termination was unjustified.  471 U.S. at 236.  In his subsequent suit, Webb sued the Dyer County Board of Education and several individual defendants, claiming the Board's action was unconstitutional and sought to bring a class action.  <u>Id.</u> at 237.  In <u>Perkins</u>, a number of individuals were arrested by West Helena, Arkansas police officers, were tried on charges of impeding traffic, but only one was convicted.  728 F.2d at 1100.  Subsequently, six of those arrested and tried, sued various West Helena officials alleging violation of their constitutional rights.  <u>Id.</u>  In <u>McDonald</u>, the petitioner in an habeas action alleged that the living conditions of Missouri State Penitentiary's death row were unconstitutional.  860 F.2d at 1462.  Thereafter, inmates confined under sentence of death at the Penitentiary, including the habeas petitioner, brought a § 1983 class action alleging violations of their constitutional rights due to the conditions and practices on death row.  <u>Id.</u> at 1457.  In <u>Bobbitt</u>, following her discharge from the first shift at Paramount Cap Manufacturing Company and offer of employment on a different shift, Bobbitt left her job and initiated proceedings before the Missouri Division of Employment Security (MoDES) for unemployment benefits.  942 F.2d at 513.  The MoDES determined that Bobbitt had voluntarily left her job for good cause due to her employer's misconduct or because she had been constructively discharged.  Bobbitt then sued Paramount claiming violations of Title VII of the Civil Rights Act, the Missouri Human Rights Act, and Equal Pay Act, and also alleged that she had been constructively discharged when removed from the first shift because of her sex.  <u>Id.</u>

As a final matter, the Court rejected Dunnigan's request for an "enhancement" of Goolsby's fees. This request is based solely on her own unproven claim that her award of fees was delayed for a period of 17 months due to Freddie Mac's "misrepresentation" of "false information." Pl.'s Mem., pp. 16-17. Perdue, cited by Dunnigan, stands for the general proposition that the lodestar method is presumptively sufficient to calculate an attorney's fee award, and that in only "extraordinary," "rare," or "exceptional" circumstances is enhancement appropriate. 559 U.S. at 546, 551-554. An enhancement may be appropriate when there has been "exceptional delay" in the payment of statutory fees. Id. at 556.

As the Supreme Court explained:

> An attorney who expects to be compensated under § 1988 presumably understands that payment of fees will generally not come until the end of the case, if at all. Compensation for this delay is generally made either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value. But we do not rule out the possibility that an enhancement may be appropriate where an attorney assumes these costs in the face of unanticipated delay, particularly where the delay is unjustifiably caused by the defense.

Id. (internal quotation marks and citations omitted).

Here, not only were Dunnigan's claims of misrepresentation of false information never adjudicated, but this Court does not find that there was any undue delay. This suit was commenced on June 2, 2015. [Docket No. 1]. Freddie Mac made its Rule 68 Offer on September 2, 2016, and Dunnigan accepted it on September 6, 2016. [Docket No. 69]. A period of 15 months from commencement to termination of the suit does not constitute exceptional delay, much less the type of extraordinary or exceptional circumstances required to support a claim of enhancement.

With these observations and judgments in mind, the Court now proceeds to consider Dunnigan's fee application.

C.    **Reasonable Hourly Rate**

"[T]he burden is on the fee applicant to produce satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum, 465 U.S. at 895, n.11. In addition, when assessing hourly rates, the Court may draw on its own experience and knowledge of prevailing market rates as well as the attorneys' descriptions of their experience. Warnock v. Archer, 397 F.3d 1024, 1027 (8th Cir. 2005). Dunnigan submitted a declaration from Goolsby, which described his experience and affidavits from four other consumer-rights attorneys who attested that Goolsby's hourly rate was reasonable. Declaration of Peter F. Barry, ¶¶ 30-39 [Docket No. 78]; Declaration of Sylvia A. Goldsmith, ¶ 15 [Docket No. 79]; Declaration of Paul B. Mengedoth, ¶ 14 [Docket No. 80]; and Declaration of Mark L. Heaney, ¶ 9 [Docket No. 81].

The Court finds Goolsby's hourly billing rate of $350 to be reasonable and in keeping with the prevailing market rates for attorneys in the Twin Cities with similar levels of experience. Warnock, 397 F.3d at 1027; Gupta v. Arrow Fin. Servs., LLC, Civ. No. 09-3313 (SRN/SER), 2012 WL 1060054, at *2 (D. Minn. Mar. 29, 2012) (approving hourly rate of $425 for Peter F. Barry and stating "[t]here is sufficient case law in this district to support an hourly rate of between $350-$450 per hour in consumer law cases, commensurate with a given attorney's experience and expertise.") (citations omitted).

Likewise, to the extent that this Court finds that services performed by Goolsby were both compensable and the sort that would be performed by a paralegal, the Court finds that $100 per hour for those services was reasonable.

### D.    Work Performed in Equifax Suit

Dunnigan seeks an award in the amount of $45,524.17 for all work performed in the Equifax Suit.   Goolsby Decl., Ex. B.   Included within this sum are a host of administrative and legal tasks ranging from –

> phone calls and emails with the client, drafting the complaint against Equifax, reviewing Equifax's answer to the complaint, calendaring tasks, making and changing flight reservations, reviewing documents produced by Equifax, conducting the Rule 26(f) conference with Equifax, preparing the Rule 26(f) Report with Equifax, preparing Rule 26(a) disclosures, drafting and reviewing correspondence, drafting discovery and deposition notices directed to Equifax and responding to Equifax's discovery, reviewing Dunnigan's documents, preparing Dunnigan for and attending her deposition, engaging in settlement related activities, preparing pleadings to amend the scheduling order –

to preparing the subpoena for documents to Freddie Mac, conducting research bearing on Freddie Mac's objections to the document subpoena, preparing for and attending the Equifax deposition, and preparing for and attending the Freddie Mac depositions. Goolsby Decl., Ex. D.

The Court has carefully examined the description of services expended by Goolsby in the Equifax Suit.   Id.   The Court is satisfied that the work performed on behalf of Dunnigan to obtain documents from Freddie Mac, prepare for and take the one Equifax deposition, and prepare for and attend the four Freddie Mac depositions – all for the purpose of discovering relevant witnesses and ultimately, who was the source of the delinquency reported on Dunnigan's credit reports – was sufficiently relevant to the

successful outcome of the suit against Freddie Mac.  Further, these services are clearly the type of investigative work that would have been performed in this litigation had they not been carried out in the Equifax Suit.  Thus, this Court recommends that the award of attorney's fees include the sum of $14,320.02, representing the time expended by Goolsby for these services.[6]  See, Goolsby Decl., Ex. C (categories labeled 6, 13, 15).

The Court rejected the balance of the fees incurred by Dunnigan in the Equifax Suit ($31,204.15) because the Court has no factual basis from which it could conclude that any or all of this work was necessary to the successful resolution of her case against Freddie Mac.  Goolsby's general statements that Dunnigan relied "substantially" on information obtained in discovery in the Equifax Suit to draft pleadings, to develop her own discovery, to respond to discovery and to support her settlement demands in the instant case, (Goolsby Decl., ¶¶17-20), without more, are insufficient for this Court to conclude that all services conducted in the Equifax Suit were relevant to and would

---

[6]   Document Subpoena to Freddie Mac – for services performed on May 7, 2014, July 1, 2014, October 20, 2014, and March 9, 2015 ($1,568.34).

Freddie Mac deposition preparation – for services performed on April 6, 9 and 12, 2015 ($3,348.34).

Freddie Mac Depositions – for services performed on April 13 and 14, 2015 ($3,237.50).

Equifax deposition preparation – for services performed on February 19 and 20, 2015, and March 9 and 10, 2015 ($4,526.67).

Equifax deposition – for services performed on March 11, 2015 ($1,639.17).

The Court did not include any time associated with research performed by Goolsby bearing on Freddie Mac's objections to the document subpoena, as no information was provided to the Court regarding the nature of Freddie Mac's objections or the research conducted.

have performed in the instant action against Freddie Mac.   Moreover, even if not rejected on those grounds, many of the services as not compensable for the very same reasons set out below in connection Dunnigan's petition for fees incurred in the suit against Freddie Mac – they constituted administrative tasks or the entries were too vague to determine whether they were reasonably incurred.

In summary, Dunnigan is entitled to an award for fees incurred in connection with the Equifax Suit in the amount of $14,320.02 and the Court will reduce the baseline request of attorney's fees by **$31,204.15**.

### E.   Reasonably Expended Hours

#### 1.   Administrative Tasks

Fees for clerical or ministerial services, which could have been performed by a non-timekeeper, should not be awarded in a fee petition.   Shrader v. OMC Aluminum Boat Group, Inc., 128 F.3d 1218, 1222 (8th Cir. 1997); see also, Mogck v. Unum Life Ins. Co. of Amer., 289 F.Supp.2d 1181, 1193 (S.D.Cal. 2003) ("'[W]hen a lawyer spends time on tasks that are easily delegable to non-professional assistance, legal service rates are not applicable.'") (quoting New Mexico Citizens for Clean Air & Water v. Espanola Mercantile Co., Inc., 72 F.3d 830, 835 (10th Cir.1996)).

The Court has considered the fact that Goolsby is a sole practitioner who appears to practice without the help of a paralegal or clerical staff.   See Goolsby Decl., ¶ 10.   It is unclear whether Goolsby even has office staff to assist him.   While the Court is sympathetic to the loss of billable time a solo practitioner with minimal clerical support experiences, this does not mean that purely administrative tasks are compensable. Therefore, it is not appropriate for Dunnigan to recover fees from Freddie Mac for the

following entries (some billed at $100 per hour, some billed at $350 per hour), which reflect purely non-legal, clerical tasks:  6/2/15 ("civ. cover sheet") ($21.67); 9/2/15 ("file stip") ($26.67); 9/4/15 ("file stip") ($25.00); 9/4/15 ("review procedures for filing under seal") ($350); 1/8/16 ("calendar") ($16.67); 1/8/16 ("file proof of service") ($18.33); 1/19/16 ("calendar") ($33.33); 2/5/16 ("sort time on FM only v. other") ($186.67); 2/16/16 ("prep docs for client") ($36.67); 3/16/16 ("schedule stlmt conf.") ($10.00); both entries for 3/21/16 (relating to "paperwork for obtaining Weidman docs") (totaling $20.00); 3/23/16 ("medical authorization forms, email client") ($175); 3/31/16 (file stipulation to amend complaint, 2d amend complaint") ($33.33); 4/1/16 ("Index FM docs") ($291.67); 4/4/16 ("get new hearing date, email Opposing Counsel") ($122.50); 5/2/16 ("calendar") ($16.67); 5/5/16 ("create index for Freddie doc production") ($169.17); 5/12/16 ("phone ct for hearing date on mot to compel, email Opposing Counsel") ($198.33); 7/15/16[7] ("organize file, prep docs, consider objections for post 2013 medical records") ($495.83); 7/21/16 ("index new FM docs") ($280.00); 7/25/16 ("update timeline of mortgage apps based on new disco responses") ($87.50); 7/25/16 ("update spreadsheet of who appears on what docs") ($425.83); 7/25/16 ("phone ct for hearing date on mot to compel, email Opposing Counsel") ($30.00); 8/1/16 ("research flights to DC") ($33.33); 8/2/16 ("phone court reporting co for copy of Stull depo video") ($13.33); 8/3/16 ("consider calendar, email Opposing Counsel") ($151.67); 8/12/16 ("file amended stipulation to amend sched ord") ($18.33); both entries for 9/19/16 ("clean up time

---

[7]      This entry is blocked billed with "consider objections for post 2013 medical records," which may indicate legal work.  Nonetheless, the Court cannot separate the possibly allowable time from the clerical part of the entry and, therefore, disallows the entire entry.

entries, ie, decipher short hand, proof read") (totaling $589.17); 9/26/16 ("file mot for atty's fees and nontaxable costs") ($11.67).

These entries represent a reduction in the requested fees of **$3,888.34**.

### 2. Vague Entries

A court may reduce the hours claimed where the billing entries are so vague that the court cannot determine whether the time spent was reasonably necessary or redundant. See Hensley, 461 U.S. at 433 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."). Insufficient documentation may warrant a reduction in the fees requested because "incomplete or imprecise billing records preclude any meaningful review by the district court of the fee application." H.J. Inc. v. Flygt Corp., 925 F.2d 257, 260 (8th Cir.1991) (affirming the district court's 20% reduction in requested attorney fees for inadequate documentation); see also U.S. ex rel. Thompson v. Walgreen Co., 621 F. Supp. 2d 710, 727–28 (D. Minn. 2009) (disallowing vague and generic billing entries); Stepnes v. Ritschel, No. 08-5296 (ADM/JJK), Report and Recommendation, 2010 WL 2243428, at *3 (D. Minn. Mar. 22, 2010), Report and Recommendation adopted, No. 08-5296 (ADM/JJK), 2010 WL 2243424 (D. Minn. June 1, 2010) (reducing fees where many of the entries provided "so little detail that [the] Court [could not] even determine the nature of the work performed, let alone whether it was reasonably necessary…"); Bores, 2008 WL 4755834, at *6 (reducing number of hours claimed by defendant where records were "replete with vague entries" and counsel "heavily redacted" them, which "le[ft] the Court in the dark as to the precise nature of the work performed.") (citations omitted).

Many of the entries submitted by Goolsby are so vague or general that this Court lacked sufficient information to determine their appropriateness.

For starters, Dunnigan sought to recover fees associated with "client communications" in the amount of $4,240.83, which generally appear on the billing records as "email client," "phone client, "phone from client," or "meet client." See Goolsby Decl., Ex. B (summarizing "client communications"); Ex. D (itemizing entries labeled category 21). Lacking any understanding as to the content of these communications, the Court cannot determine the role they played in bringing the suit to successful resolution or whether they were reasonably necessary. Therefore, the Court disallows these fees in the amount of $4,240.83.

In addition, the Court found the following entries so vague as to be unallowable: 7/21/15 ("prep call with Opposing Counsel") ($64.17); 7/21/15 ("phone from Opposing Counsel") ($128.33); 7/24/15 ("email Opposing Counsel") ($29.17); 8/3/15 ("review file for response to Opposing Counsel email, email Opposing Counsel") ($437.50); 9/22/15 ("email Opposing Counsel") ($46.67); 1/13/16 ("Protective order") ($99.17); 1/14/16 ("protective order, email Opposing Counsel") ($169.17); 2/5/16 ("sort time on FM only v. other") ($186.67); 2/12/16 ("review procedure for access to hearing transcript") ($33.33); 2/16/16 ("attempted to review docs from FM, unsuccessfully tried to figure out how to open docs produced in .lnk format") ($93.33); 3/14/16 ("research procedure for getting docs from E.D. Pa, call E.D. pa, im, notes thereon") ($175.00); 4/5/16 (all three entries referencing indexing of loan applications and review court policies on ESI) ($781.67); 5/25/16 ("respond Opposing Counsel email, review file therefor") ($157.50); 7/26/16 ("respond Opposing Counsel email") ($64.17); 8/11/16 ("email Opposing Counsel")

($87.50); 8/17/16 ("phone client, prep therefore") ($140.00); 8/17/16 ("begin to compose email to Opposing Counsel") ($35.00); 8/17/16 (phone client, finish composing email to Opposing Counsel, send it") ($93.33); 9/1/16 ("phone Opposing Counsel Landman, phone client lm") ($40.83); 10/5/16 ("email fees expert") ($122.50); 10/6/16 ("phone from Landman") ($17.50); 10/31/16 ("Phone from OC Silverman") ($75.83).  These additional entries account for a further reduction of $3,078.34.

The total reduction in this category[8] is **$7,319.17**.

### 3.   Unnecessary Work

The Court may disallow fees incurred for unnecessary work.  <u>Miller v. Dugan</u>, 764 F.3d 826, 832 (8th Cir. 2014) (citing <u>Hensley</u>, 461 U.S. at 434).  Here, Dunnigan sought fees for a response to a summary judgment motion that was never brought; motions to compel that were never filed; her own motion for partial summary judgment, which she never brought; the preparation of depositions that were never taken; experts that were never disclosed; and the drafting of jury instructions and a verdict form for a trial that never took place.[9]  The Court must be satisfied that the hours billed were necessary and not unreasonable.  With respect to activities that did not materialize, the Court cannot so conclude.  As a result, the Court recommends that the following hours be disallowed: 6/15/15 ("research purposeful availment in anticipation of FM argument for lack of personal jurisdiction, as FM tried to argue when subpoenaed") ($134.17);

---

[8]     The issue of vagueness also played a role in the Court's determination of fees incurred by Dunnigan with respect to discovery conducted in this case.  However, that category of services is addressed in the section below on excessive hours.

[9]     Notably, under the operative scheduling order entered on April 24, 2016, the deadline for initial disclosures of experts was October 1, 2016, the deadline for contacting the District Court to <u>schedule</u> a dispositive motion was January 1, 2017, and the trial ready date was set for May 1, 2017.  [Docket No. 54].

12/14/15 ("application for default") ($175.00); 1/21/16 ("draft verdict form") ($466.67); 1/22/16 ("draft jury instructions") ($99.17); 1/22/16 and 1/25/16 (relating to anticipated summary judgment motion) (totaling $991.66); 1/28/16, 2/1/16 and 2/4/16 (relating to "mem in opp'n to (anticipated msj)" blocked billed with "stlmt ltr to mag.") totaling $3,698.34); 3/14/16 and 3/15/16 (both relating to "mem in opp'n to anticipated msj" totaling $1,277.50); 4/4/16 ("draft mot to compel") ($227.50); 5/5/16, 5/11/16, and 5/12/16 (all entries regarding phoning and researching "potential expert") ($1,475.83); 5/25/16 (all entries relating to preparing memorandum in support of or opposing summary judgment) (totaling $1,207.51); 5/27/16 ("draft mem in sup of mot to compel") ($280.00); 6/2/16 (all entries relating to drafting motion to compel) (totaling $1,340.84); 6/14/16 ("prep for depos") ($320.83); 6/27/16 (all entries relating to drafting 30(b)(6) notice, preparation for depositions and memos on "anticipated "sj motions") (totaling $684.16); 7/22/16 (two entries: "review file, prepare for depos") (totaling $431.66); 7/25/16 ("draft mem in sup of p's msj") ($536.67); 7/28/16 (draft mot to compel) ($700); 7/28/16 ("prep depos") ($700); 7/29/16 (three entries "prep depos") (totally $495.84); 7/29/16 (draft mot to compel) ($595); 8/1/16, 8/2/16 and 8/4/16 (all entries regarding drafting "depo notices" and "30(b)(6) notice" (totaling $2,053.34); 8/8/16 ("prep depos") ($233.33); 8/19/16 (both entries, "review docs, prep for FM depos") (totaling $875); 8/22/16 ("review docs prep for FM depos") ($274.17); 8/23/16 ("review docs prep for depos") ($542.50); 8/29/16 ("prep depos") ($519.17).

These entries total **$20,335.86**.

### 4.      Excessive Hours

An award of fees must be based on time that was "reasonably expended." Hensley, 461 U.S. at 434.  The Court has concluded that Dunnigan is seeking an award for fees that are excessive and should be reduced.

First, Goolsby spent nearly 11 hours preparing a Rule 26(f) report.  Goolsby Decl., Ex. D (category labeled 20).  After reviewing the report and taking into account Goolsby's experience level, the Court determined that this amount of time was excessive.  Consequently, the Court recommends allocating two hours for preparation of the report, resulting in a reduction in fees of $3,150.00.

Second, Goolsby spent over 75 hours responding to Freddie Mac's first and second motions to dismiss, plus in excess of 29 hours devoted to both the first motion to dismiss and amendment of the complaint.  On August 14, 2015, Freddie Mac brought its initial motion to dismiss, arguing that the Complaint, which asserted two counts under the FCRA, failed to state a claim as a matter of law against Freddie Mac because it had furnished no consumer report, was not a consumer reporting agency, and therefore, was not subject to the FCRA.  See Defendant's Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint, pp. 1-12 [Docket No. 13].  Freddie Mac also contended that the "Caution" Certificate generated by its Loan Prospector software tool was accurate.  Id., pp. 13-14.  Dunnigan prepared a response to the motion and at the same time, drafted an Amended Complaint.  On September 11, 2015, Dunnigan filed her Amended Complaint by stipulation of the parties filed on September 4, 2015.  See Docket Nos. 18, 20.  In the Amended Complaint, Dunnigan added facts to bolster her claims that Freddie Mac was a credit reporting agency, had inaccurately reported the

status of her mortgage with M & T Bank, and continued to mispresent that the source of the inaccuracy was Equifax and not Freddie Mac.   See e.g., Amended Complaint, ¶¶ 16, 23-27, 37-39, 59, 72, 73, 78, 79, 88, 89, 96-98, 105, 107. Further, Dunnigan added counts alleging state law claims of defamation, negligence, fraud, negligent misrepresentation, and intentional infliction of emotional distress.   Id., Counts III-VII, ¶¶ 120-140.

On September 18, 2015, Dunnigan filed her opposition to Freddie Mac's motion to dismiss, and critical to this Court's thinking, premised her arguments on the Amended Complaint.   See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss Plaintiff's Complaint, pp. 1-37 [Docket No. 22]. On September 22, 2015, Freddie Mac withdrew the motion to dismiss; on October 9, 2015, it filed the second motion to dismiss seeking to dismiss all counts of the Amended Complaint except Count III (defamation) and Count VII (intentional infliction of emotional distress). Freddie Mac's arguments with respect to the FCRA (Counts I and II), were very similar to the arguments it had made in its first motion to dismiss.   See Defendant's Memorandum of Law in Support of its Partial Motion to Dismiss Plaintiff's Complaint, pp. 1-19 [Docket No. 31]. The arguments bearing on the state law claims of negligence, fraud, and negligent misrepresentation were new.   Id., pp. 20-24.

On October 30, 2015, Dunnigan filed her opposition to Freddie Mac's second motion to dismiss.   This memorandum was virtually identical to Dunnigan's response to Freddie Mac's first motion to dismiss regarding the FCRA Counts.   See Plaintiff's Memorandum of Law in Opposition to Defendant's Partial Motion to Dismiss Plaintiff's

Complaint, pp. 1-40 [Docket No. 32].  The balance of her opposition memorandum was devoted to the state law claims.  Id., pp. 40-45.

Between August 26 and September 11, 2015, Goolsby blocked billed 29 hours for work on the Amended Complaint and the response to the motion to dismiss.[10] Goolsby Decl., Ex. D (entries labeled category 27); see also Goolsby Decl., Ex. B (describing category 27 as "Miscellaneous, or block billing").[11]  During this same time period, between August 24 and September 18, 2015, Goolsby separately billed more than 50 hours for drafting the response to the motion to dismiss.  Goolsby Decl., Ex. D (entries labeled category 29).   Between October 14 and October 30, 2015, Goolsby expended approximately 25 hours drafting that part of the opposition memorandum to Freddie Mac's second motion to dismiss bearing on the FCRA counts.  Id.

The Court finds that approximately 105 hours devoted to the first and second motions to dismiss to be excessive.  Based on this Court's knowledge, experience, and expertise of the time required to complete similar activities, the Court concludes that one work week or 40 hours ($14,000) is reasonable to respond to these nearly identical

---

[10]    In addition, Goolsby billed approximately another 5 hours exclusively to the Amended Complaint.  Goolsby Decl., Ex. D (entries labeled category 17).  The Court has no idea how much of this time was devoted to the additional facts alleged to support the FCRA counts versus the facts to support and the contents of the state law counts, as Dunnigan did not break this out in category 31 (work exclusively related to state law claims).

[11]    The Eighth Circuit does not prohibit block billing.  Ewald v. Royal Norwegian Embassy, Civ. No. 11-2116 (SRN/SER), 2015 WL 1746375, at *8 (D. Minn. Apr. 13, 2015) (citation omitted).  Nonetheless, imprecise billing records prevents the Court from conducting a meaningful review of the attorney's fees and are a basis for reducing an award.  Hensley, 461 U.S. at 433.  The Court presumes that the bulk of the 29 hours was spent on the response to the motion to dismiss, as five hours spent on amending the complaint was more than adequate to add the additional facts bearing on the FCRA counts.

motions.  See Edwards v. Multiband Corp., No. 10-2826 (MJD/JJK), 2011 WL 6122277, at *2 (D. Minn. Dec. 5, 2011) (finding 50.8 hours defense counsel claimed to have spent drafting and revising its memorandum and 21.2 hours reviewing plaintiffs' opposition papers and preparing for hearing on motion for sanctions unreasonable). Consequently, the Court finds that this portion of the fee petition should be reduced by $22,814.16.

Third, the Court finds that an expenditure of nearly 150 hours (almost four full work weeks) and $50,000 on written discovery to be excessive.  This is a case in which no depositions were conducted (depositions bearing on Freddie Mac's role in this case were taken in the Equifax Suit) and some documents had already obtained from Freddie Mac in the Equifax Suit.  Yet, according to Dunnigan, Goolsby spent 61 hours ($21,723.33) responding to Freddie Mac's written discovery and another 84.41 hours ($29,855.83) conducting her own written discovery directed to Freddie Mac and contemplating depositions to be taken.  Goolsby Decl., Ex. B (categories labeled 24 and 25);[12] Ex. D.  Even taking into account the time associated with those services that the Court has already excluded for other reasons above, Goolsby spent 63.88 hours ($21,425.84) related to the Rule 26(a) disclosures and responding to Freddie Mac's written discovery, and 56.73 hours ($19,892.49) in connection with the drafting and pursuit of discovery directed to Freddie Mac.  Lacking any information regarding the content of the written discovery (many of the entries regarding discovery vaguely stated

---

[12]    Included within these categories was time expended in drafting motions to compel and deposition notices, preparing for depositions and communicating with the client, all of which already have been disallowed by the Court above.  Additionally, the Court notes that these figures do not include any discovery-related activity set out in category 27 (miscellaneous and block billing).  Goolsby Decl., Ex. D.

"respond disco," "amended disco responses," "disco to FM") or the nature of the disputes that arose with respect to the parties' discovery, the Court had nothing from which it could determine the necessity and reasonableness of the services associated with these tasks. Therefore, applying its own knowledge, experience, and expertise of the time required to complete similar activities, the Court reduced the fees associated with the written discovery propounded by the parties in the amount $41,318.33 by 25% ($10,329.58) to $30,988.75

Lastly, almost 44 hours ($15,361.15) were spent on the fee petition (25.77 hours on the initial submission and 18.12 hours on the Reply), well in excess of the $2,100 that Dunnigan projected in her Motion for Fees. This is clearly excessive. The Court recommends allowing three 8-hour days (24 hours) for the preparation of this submission. This results in a reduction in the fees of $6,961.50.

In summary, this Court has determined that excessive hours expended on this case and therefore, her request should be reduced by **$43,255.24**: $3,150.00 for excessive hours spent on the Rule 26(f) Report; $22,814.16 for excessive hours spent on the first and second motions to dismiss; $10,329.58 for excessive hours spent on written discovery; and $6,961.50 for excessive hours spent on the Reply.

### F.   Conclusion

Applying all of the reductions described above (totaling $106,002.76) to the base amount of $205,143.33, the Court finds that Dunnigan is entitled to an award of reasonable attorneys' fees in the amount of $99,140.57 based on the following calculation:

| | |
|---|---|
| Base Amount | $205,143.33 |
| -Equifax Suit Reduction | 31,204.15 |
| -Administrative Tasks | 3,888.34 |
| -Vague Entries | 7,319.17 |
| -Unnecessary Work | 20,335.86 |
| -Excessive Hours | 43,255.24 |
| **Total Allowable Attorney Fees** | **$99,140.57** |

## II.    FILING UNDER SEAL

Dunnigan filed a redacted Reply brief in connection with her motion for fees, and filed under seal Exhibits A and B to the Second Declaration of John Goolsby submitted in connection with the Reply brief.  See Docket Nos. 88, 88-1, 88-2.  Dunnigan's counsel informed the Court that there was a dispute regarding whether these documents should remain under seal or redacted.  In the normal course, the Court would have taken up this issue at the hearing on the motion.  See Protective Order [Docket No. 43], ¶ 10.  However, as no hearing was held on the fee petition, the parties were directed to describe their respective positions in letters to the Court.  The parties complied with the Court's directive.

Exhibit A is a 4-page excerpt from a deposition of Shawn Martin (including the cover page of the transcript) and a 3-page exhibit to that deposition.  Exhibit B is a 3-page excerpt of a deposition of April Stull (including the cover page of the transcript).  Both Martin and Stull were Freddie Mac employees who were deposed in connection with the Equifax Suit.  Dunnigan referenced these depositions in her Reply memorandum in support of her argument that she was entitled to fees for the Equifax lawsuit.  Pl.'s Reply, p. 3.  Dunnigan specifically claimed that Stull and Martin provided information regarding Freddie Mac's reporting systems and how and why those systems reported a mortgage payment delinquency.  Id.

Freddie Mac contended that these depositions had been marked as "Confidential" in the Equifax Suit and the information reflected in them should not be made public in this lawsuit.  Further, Freddie Mac claimed that undertaking a full review of the excerpts for the purpose of Dunnigan's very belated request for de-designation would require substantial time and expense on Freddie Mac's part.  But even without a full-blown confidentiality review, Freddie Mac's counsel asserted that the excerpts reflected proprietary information regarding Freddie Mac's reporting systems that is not public.

Dunnigan responded that the designation of the excerpts as "Confidential" was not dispositive of the ultimate question of whether the documents should remain under seal.  Further, the public has a common law right of access to judicial documents and on that basis, the documents should be unsealed.  Moreover, Freddie Mac failed to show how it would be harmed by unsealing the documents.

Federal Rule of Civil Procedure 26 anticipates that information a party deems confidential may be sealed.  The Rule provides, in relevant part, that courts may, for good cause "issue [a protective] order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense, including. . . that a trade secret or other confidential research, development, or commercial information may not be revealed or be revealed only in a specified way [.]."  Fed. R. Civ. P. 26(c)(1)(G).  A party seeking protection under Rule 26(c) must provide specific facts demonstrating that protection of information is necessary, as opposed to "stereotyped and conclusory statements."  Gulf Oil Co. v. Bernard, 452 U.S. 89, 102 n. 16 (1981) (citations omitted); see also Baxter Intern., Inc. v. Abbott Laboratories, 297 F.3d 544, 545 (7th Cir. 2002)

("[T]he parties' joint motion made no effort to justify the claim of secrecy.  It was simply asserted, mostly on the basis of the agreement but partly on the ground that these are commercial documents.  That won't do.") (citation omitted); <u>Arvco Container Corp. v. Weyerhaeuser Co.</u>, Civ. No. 1:08–548, 2009 WL 311125, at *8 (W.D. Mich. Feb. 9, 2009) ("'[V]ague and conclusory allegations of confidentiality and competitive harm are insufficient.  The movant must make 'a particularized showing that the information sought is confidential' and come forward with 'specific examples' of competitive harm."); "Whether trade secrets are involved or not, and whether their revelation will cause damage to someone, are questions of fact, to be decided [by the court] after receiving evidence."  <u>In re Iowa Freedom of Info. Council,</u> 724 F.2d 658, 663 (8th Cir. 1983). Courts should not simply accept representations of interested counsel at face value, but should conduct a limited in camera review of documents alleged to contain trade secrets and other proprietary information.  <u>Id.</u> at 662-63.  The court must then determine if good cause exists to keep the documents under seal.   <u>Healy v. I-Flow, LLC</u>, 282 F.R.D. 211, 215 (D. Minn. 2012).

There is a common law right of access to judicial records.  <u>Webster Groves Sch. Dist. v. Pulitzer Pub. Co.</u>, 898 F.2d 1371, 1376 (1990) (citing <u>Nixon v. Warner Commc'ns</u>, 435 U.S. 589, 597 (1978)).  "This right of access bolsters public confidence in the judicial system by allowing citizens to evaluate the reasonableness and fairness of judicial proceedings and 'to keep a watchful eye on the workings of public agencies.'" <u>IDT Corp. v. Ebay</u>, 709 F.3d 1220, 1222  (8th Cir. 2013) (citations omitted).  "It also provides a measure of accountability to the public at large, which pays for the courts." <u>Id.</u>  However, this right of public access is not absolute, and courts retain supervision

over their own records, with the power to weigh the parties' competing interests in deciding what records should be unsealed.  Id.  A district court's decision to seal a file is reviewed under an abuse of discretion standard, which acknowledges the district court's role in weighing the relevant facts and circumstances of the particular case.  Id. at 1224. This deference to the district court explains the Eighth Circuit's rejection of the "strong presumption" favoring public access that has been adopted by other circuits.  Webster Groves, 898 F.2d at 1376 ("When the common law right of access to judicial records is implicated, we give deference to the trial court rather than taking the approach of some circuits and recognizing a 'strong presumption' favoring access.") (citing United States v. Webbe, 791 F.2d 103, 106 (8th Cir. 1986)); see also United States v. McDougal, 103 F.3d 651, 657 (8th Cir. 1996) ("Although we recognize that there is a common law presumption in favor of public access to judicial records, . . . we note that this court in Webbe specifically rejected the strong presumption standard adopted by some circuits.") (emphasis in original), cert. denied sub nom, Citizens United v. United States, 522 U.S. 809 (1997); Kruszka v. Novartis Pharm. Corp., Civ. No. 07-2793 (DWF/JJK), -- F. Supp. 2d--, 2014 WL 2957951, at *18 (D. Minn. July 1, 2014) ("However, the Eighth Circuit does not recognize the strong presumption favoring access adopted by some circuits and thus the Court must 'weigh the competing interests' of the parties in determining whether to unseal court records.  The interest in protecting a company's internal information can warrant sealing of records.") (internal citation and quotation omitted).

"Where the common-law right of access is implicated, the court must consider the degree to which sealing a judicial record would interfere with the interests served by

the common-law right of access and balance that interference against the salutary interests served by maintaining confidentiality of the information sought to be sealed." IDT Corp., 709 F.3d at 1223.

The presumption of public access to judicial records may be overcome if the party seeking to keep the records under seal provides compelling reasons for doing so. Healy, 282 F.R.D. at 214 (citing In re Neal, 461 F.3d 1048, 1053 (8th Cir. 2006) ("Although the court is given . . . supervisory power [over its records], 'only the most compelling reasons can justify non-disclosure of judicial records.'") (quoting In re Gitto Global Corp., 422 F.3d 1, 6 (1st Cir. 2005)). "Modern cases on the common-law right of access say that 'the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and resulting value of such information to those monitoring the federal courts.'" IDT Corp., 709 F.3d at 1224 (quoting United States v. Amodeo, 71 F.3d 1044, 1049 (2d Cir. 1995)). When a document plays only a negligible role in a court's exercise of its Article III duties, the public's interest in access to the document is weak and "'the weight of the presumption is low and amounts to little more than a prediction of public access absent a countervailing reason.'" Id. (quoting Amodeo, 71 F.3d at 1050)).

The Eighth Circuit has not explicitly defined what constitutes "judicial records." But generally a presumption of public access (and concomitant need to articulate a compelling reason for non-disclosure) attaches to documents filed with the court in support of merits-based motions. Healy, 282 F.R.D. at 214 ("The [c]ourt finds that I-Flow has a heightened burden to overcome the presumptive right of the public access to the briefs and supporting documents at issue because the documents in issue were

filed with the [c]ourt in connection with a <u>merits-based motion</u> . . . .") (emphasis added)

(citing <u>Leucadia, Inc. v. Applied Extrusion Techs., Inc.</u>, 998 F.2d 157, 164 (3d Cir. 1993)

("[T]here is a presumptive right of public access to <u>pretrial motions of a non-discovery</u>

<u>nature</u>, whether preliminary or dispositive, and the material filed in connection

therewith.") (emphasis added)); <u>In re Guidant Corp. Implantable Defibrillators Prods.</u>

<u>Liab. Litig.</u>, 245 F.R.D. 632, 636 (D. Minn. 2007) ("The Court finds that Guidant and

Duran have a heightened burden to overcome the presumptive right of the public to

access of the briefs and supporting documents at issue because they were filed in

support of and in opposition to <u>motions for summary judgment</u>.") (citation omitted)

(emphasis added); <u>Cardiac Pacemakers, Inc. v. Aspen II Holding Co., Inc.</u>, Civ. No. 04-

4048 (DWF/FLN), 2006 WL 3079410, at *4 (D. Minn. Oct. 24, 2006) ("The Court finds

that Guidant has a heightened burden to overcome the presumptive right of the public to

access of the briefs and supporting documents at issue because they were filed in

support of and in opposition to motions for <u>summary judgment</u>.") (emphasis added)

(citing <u>Joy v. North</u>, 692 F.2d 880, 893 (2d Cir. 1982) ("documents used by parties

moving for, or opposing, summary judgment should not remain under seal absent the

most compelling reasons."); <u>Simon v. G.D. Searle & Co.</u>, 119 F.R.D. 683, 684 (D. Minn.

1987) ("While plaintiffs would have the law be otherwise, there is no established right of

public access to prejudgment records in civil cases.  This Court clearly has discretion to

deny access to documents filed, <u>but not admitted into evidence or relied upon by the</u>

<u>Court</u>.") (citations omitted) (emphasis added)).

Consequently, not all documents filed by parties are "judicial records;" instead, as

a general rule only those documents that are relevant to and integrally involved in the

resolution of the merits of a case are judicial records to which the presumption of public access attaches.  See e.g. In re Application for an Order Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290 (4th Cir. 2013) ("[D]ocuments filed with the court are 'judicial records' if they play a role in the adjudicative process, or adjudicate substantive rights.") (citation omitted); United States v. El–Sayegh, 131 F.3d 158, 163 (D.C. Cir. 1997) ("[W]hat makes a document a judicial record and subjects it to the common law right of access is the role it plays in the adjudicatory process."); Amodeo, 44 F.3d at 145 ("[T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document."), reversed in part on other grounds by United States v. Amodeo, 71 F.3d 1044 (2d Cir. 1995); In re Policy Mgmt. Sys. Corp., 67 F.3d 296 (table), 1995 WL 541623, at *3-4 (4th Cir. Sept. 13, 1995) ("[A] document becomes a judicial document when a court uses it in determining litigants' substantive rights.  Therefore, we conclude that a document must play a relevant and useful role in the adjudication process in order for the common law right of public access to attach." (citation and internal citation omitted); Ohio Valley Envtl. Coalition v. Elk Run Coal Co., Inc., 291 F.R.D. 114, 123 (S.D. W.Va. 2013) (noting that "judicial records" are generally defined as "documents filed with the court [that] play a role in the adjudicative process or adjudicate substantive rights") (internal quotation omitted); In re Fort Totten Metrorail Cases, 960 F. Supp. 2d 2, 6 (D. D.C. 2013) ("[W]hether something is a judicial record depends on the role it plays in the adjudicatory process.  The reason for this rule is intuitive: the concept of a judicial record assumes a judicial decision, and with no such decision, there is nothing judicial about the record.")  (internal citations omitted); E.E.O.C. v. GMT, LLC, Civ. No. 11-336,

2012 WL 2871789, at *3 (D. Neb. July 12, 2012) (observing that documents filed with discovery motions are generally not considered "judicial documents" and are not subject to the public right of access); G & C Auto Body, Inc. v. Geico Gen. Ins. Co., 2008 U.S. Dist. Lexis 124119, at *9 (N.D. Cal. March 11, 2008) (extraneous materials attached to a summary judgment motion and not directly relevant to the issues raised in the motion are not "judicial documents" subject to the heightened "compelling reasons" standard.").

In summary, in order to determine whether documents filed in connection with a motion deserve sealed status, the Court must first decide if they have been properly designated under Rule 26, and if so, then must consider whether they constitute judicial records and whether there are compelling reasons to keep them under seal.

Applying the above principles to Dunnigan's request that the redacted text in her Reply brief and Exhibits A and B to Goolsby's second declaration be de-designated, the Court concludes that this request should be granted for the simple reason that Freddie Mac has not provided any evidentiary support for its claim that the redacted text and deposition excerpts deserve protection under Rule 26.  Freddie Mac's suggestion that it would need to expend considerable time and expense to examine 7 pages of documents rings hollow.  Further, while it is true that Dunnigan's fee petition is not integrally involved in the resolution of the merits of a case, the fact is that the Court did consider and rely on these materials in its determination that Dunnigan was entitled to fees incurred with respect to the Freddie Mac depositions taken in the Equifax Suit. Consequently, the Court finds these excerpts are judicial records and given the dearth of support provided by Freddie Mac for maintaining their confidentiality, concludes that it

has not met the heightened standard for overcoming the public's right of access to them.

## III.   RECOMMENDATION

For the reasons set forth above, IT IS HEREBY RECOMMENDED that:

1.     Plaintiff's Motion for Attorney's Fees [Docket No. 71] be GRANTED in part and DENIED in part, and that plaintiff be awarded $99,140.57 in attorney's fees; and

2.     Exhibits A and B to the Second Declaration of John Goolsby [Docket Nos. 88-1 and 88-2] and plaintiff's Reply Memorandum [Docket No. 89] shall be unsealed.

Dated:        January 5, 2017

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


**NOTICE**

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **January 20, 2017**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  All briefs filed under this Rule shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.